[No. 13152.   Department One. — June 1, 1891.]

## WILLIAM F. CASHMAN, APPELLANT, v. GEORGE B. ROOT ET AL., RESPONDENTS.

CONSTITUTIONAL LAW — SALE OF STOCKS ON MARGIN — VOID CONTRACT
WITH BROKER. — An agreement between a stock-broker and his customer,
by which the broker agreed to purchase stocks for his customer, char-
ging the customer with commissions and the interest on the money ad-
vanced, and holding the stocks as security until their sale, the customer
simply receiving or paying the difference between the buying and selling
values of the stocks, is a contract for the sale of stock on margin, within
the inhibition of section 26 of article 4 of the constitution, and is void.

89   373
a103 248
a103 340
89   373
a104 599
89   373
108  385
89   373
127  118
89   373
f130 326
a130 329
89   373
e146 660

ID. — ACTION TO RECOVER PROPERTY CONVEYED IN TRUST. — The cus-
tomer may maintain an action to recover property conveyed by him to
secure the broker for advances made by him under such agreement,
without the repayment to the broker of such advances.

ID. — RELATION OF BROKER TO CUSTOMER — EVASION OF CONSTITUTION —
ILLEGAL INTENT. — The prohibition of the constitution cannot be evaded
by interposing the broker between the seller and purchaser of the stocks;
and although for all ordinary purposes the stock-broker purchases stock
as agent of his customer, and then holds the stock as a pledge to secure
the debt, yet if by their agreement the customer is enabled to purchase
stock on margin, the agreement is within the prohibition of section 26
of article 4 of the constitution; and the fact that the broker did not
himself sell to the customer, but was only the instrument through whom
the illegal end was accomplished, would make no difference, the broker
being privy to the design.

APPEAL from a judgment of the Superior Court of the
city and county of San Francisco, and from an order
denying a new trial.

The facts are stated in the opinion.

*P. Reddy*, and *W. H. Metson*, for Appellant.

The language used by the parties shows an express
contract (Civ. Code, sec. 1620) to buy and sell shares of
the capital stock of corporations "on margin." The
language of a contract is to govern its interpretation, if
the language is clear and explicit and does not involve
an absurdity. (Civ. Code, sec. 1638.) When the lan-
guage of a contract is not ambiguous, the rule is impera-
tive to follow the language employed in its interpretation.
(*Hawley* v. *Brumagim*, 33 Cal. 394.) This rule applies
as well to oral as to written contracts. (1 Parsons on
Contracts, 7, 8; *Troop* on Verbal Argeements, sec. 138;
*Wagner* v. *Halleck*, 3 Col. 185.) There was no room for
construction of the contract. The language was clear
and explicit, and distinctly expressed the intention of
engaging in buying and selling shares of the capital
stock of corporations on margin. (*Markham* v. *Jaudon*,
41 N. Y. 239; Lewis on Stocks, 124; Dos Passos on Stock-
brokers, 103, 104; Cook on Stocks, 2d ed., sec. 457, and

notes; Dewey on Contracts, 106–115; notes to *Cobb* v. *Prell*, 22 Am. Law Reg. 612, 613.) Margin means, in the brokers' lexicon, additional collateral security against loss to the broker while he is carrying stock for his employer. (*McNeil* v. *Tenth National Bank*, 55 Barb. 64; *Stenton* v. *Jerome*, 54 N. Y. 481.) A sale on margin is merely a sale of stock on time, the stock being retained as security, and not delivered until final payment is made. (Debates on the Constitution, vol. 2, p. 806.) The defendant Hooker being at the time of the making of the contract a member of the San Francisco Stock and Exchange Board of Brokers, and the plaintiff having been engaged for years before that time in buying and selling stocks on margin in that market, both of the parties should be presumed to have understood the term "on margin," and to have used it with the trade meaning. (Jones on Contracts, sec. 116, p. 167; Dos Passos on Stockbrokers, 359, 361; *Hatch* v. *Douglass*, 48 Conn. 116; 40 Am. Rep. 154.) It is no part of the broker's function to receive the property bought or sold by him, still less to pay the price or take the delivery in his own name. (Cook on Stocks, 2d ed., sec. 457; Bisbee and Simonds on Board of Trade and Produce Exchange, sec. 103; Story on Agency, sec. 28; Dos Passos on Stock-brokers, 108–111; Mechem on Agency, sec. 936; *Child* v. *Hugg*, 41 Cal. 519; Jones on Pledges, sec. 495.) A broker acts in ·a threefold capacity. First, in purchasing the stock, he is an agent; then, in advancing the money for the purchase, he becomes a creditor; and finally, in holding the stock to secure the advances made, he becomes a pledgee of it. (Jones on Pledges, sec. 496; Colebrook on Collateral Securities, sec. 306; Lewis on Stocks, 128; *Markham* v. *Jaudon*, 41 N. Y. 240.) Where a broker and customer are dealing in stocks on margin, the broker is a principal and one of the parties to the contract, and not a mere agent. (*Ruchizky* v. *De Haven*, 97 Pa. St. 202–205; *Whitesides* v. *Hunt*, 97 Ind. 191; 49

Am. Rep. 441; *Beveridge* v. *Hewitt*, 8 Brad. App. 468; *Flagg* v. *Baldwin*, 38 N. J. Eq. 219; 48 Am. Rep. 308; *Justh* v. *Holliday*, 11 Wash. L. Rep. 418; *Cobb* v. *Prell*, 22 Am. Law Reg., N. S., 609; Cook on Stocks, sec. 345, 346.) The evidence shows that the account was founded upon an illegal and void contract, and it therefore created no indebtedness. A debt denotes an obligation on the part of the debtor, and the right on the part of the creditor to enforce payment. (Rapalje and Lawrence's Law Dict.) The contract was void. (Const., art. 4, sec. 26.) The provisions of the constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise. (Const., art. 1, sec. 22; *Ewing* v. *Oroville M. Co.*, 56 Cal. 654.) The contract was illegal under subdivision 2 of section 1667 of the Civil Code of California. The policy of the state was established by section 26 of article 4 of the constitution. Although contracts for the sale of stocks "on margin" may not be expressly prohibited by this section, they are, nevertheless, illegal, because contrary to the policy of the state established by the provision of the constitution above cited. (Greenhood on Public Policy, rules 1, 2, p. 1; *Bell* v. *Leggett*, 7 N. Y. 176; *Higgins* v. *Higgins*, 55 Mo. 346; *Gibbs* v. *Smith*, 115 Mass. 592; Story's Eq. Jur., sec. 293; 2 Parsons on Contracts, c. 2, sec. 3, pp. 388–390; *Smith* v. *Johnson*, 37 Ala. 633; *Maybin* v. *Coulon*, 4 Dall. 298.) There was no indebtedness, even though the defendant Hooker acted as a broker. (*Irwin* v. *Williar*, 110 U. S. 510; *In re Green*, 7 Biss. 343; *Kirkpatrick* v. *Adams*, 20 Fed. Rep. 287; *Thompson* v. *Cummings*, 68 Ga. 125; *Barnard* v. *Backhaus*, 52 Wis. 593; *Bartlett* v. *Smith*, 13 Fed. Rep. 263; *Tenney* v. *Foote*, 95 Ill. 99; *North* v. *Phillips*, 89 Pa. St. 250; *Fareira* v. *Gabell*, 89 Pa. St. 89; *Swanger* v. *Mayberry*, 59 Cal. 94.) The contract and dealings between the parties being void, all securities thereunder are also void. (Cook on Stocks, secs. 343, 347.)

*Charles J. Heggerty,* for Respondent.

All corporations are not required to have a capital stock. (Civ. Code, secs. 290, 298.) It must be proved that there was a corporation in existence, and that such corporation had shares of capital stock, and that contracts for the sale of such shares of capital stock were made, and the indebtedness thereby accrued, before the court can say that the indebtedness arose from acts and transactions prohibited and held void by section 26 of article 4 of the constitution. The indebtedness was not created by nor were the transactions between Cashman and Hooker " contracts for the sale of the shares of the capital stock of any corporation or association on margin, or to be delivered at a future day," within the meaning of section 26, article 4, constitution of California. (Dos Passos on Stock-brokers, 383–386.) Although where no delivery is contemplated, where the differences in market value only are to be arrived at, and where the transaction is a speculation, pure and simple, upon the supposed values of property never in existence, the claim of a broker for advances made is based upon a contract which is tainted with illegality, and the broker is *in pari delicto,* yet where the broker, acting for a principal, has entered into agreements in behalf of his principal, he may recover for the money paid out, commissions, etc., although the principals would be unable to enforce the contract as between themselves. (Dos Passos on Stock-brokers, 410, 411; *Irwin* v. *Williar,* 110 U. S. 510; *Ruchizky* v. *De Haven,* 97 Pa. St. 202; *Stenton* v. *Jerome,* 54 N. Y. 481; *Whitesides* v. *Hunt,* 97 Ind. 191; 49 Am. Rep. 441; *Beveridge* v. *Hewitt,* 8 Brad. App. 468; *In re Green,* 7 Biss. 343.)

TEMPLE, C. — This action is brought to compel a conveyance to plaintiff of certain real estate, which it is averred was conveyed by plaintiff to defendant Root on the 18th of June, 1884, in trust, to secure the payment

by plaintiff to defendant Hooker of any indebtedness which might exist within six months after the 14th of July, 1885.

The complaint alleges that plaintiff was not, at the commencement of the suit, and for a long time prior had not been, indebted to Hooker in any amount whatever.

Demand for a deed, and refusal, are also averred.

The answers admit that the conveyance was made in trust as charged in the complaint, but charge that plaintiff is still indebted to defendant Hooker in the sum of $2,347.

Defendant Hooker was a stock-broker engaged in buying and selling mining stocks in San Francisco, on margin or otherwise, as required. Plaintiff had been a regular customer of Hooker for many years, and had lost heavily in stock speculations. Being, as Hooker testified, rather short of money, he conveyed the property sued for, in trust, to defendant Root, who was in Hooker's employ, to cover margins, and to enable plaintiff to continue his speculations in stock. Hooker states that he valued it at about three thousand dollars, and to that extent plaintiff could buy on margin without actually putting up money.

They continued to deal together until Hooker's business was closed by his insolvency, in December, 1886, at which time Hooker held certain stocks for plaintiff, and according to Hooker's books, plaintiff owed him $2,347.

Plaintiff does not dispute the correctness of the account according to the course of dealing between the parties or their understanding at the time, but claims that the debt is illegal and the contract to pay void, under section 26 of article 4 of the constitution of this state. It reads as follows: "All contracts for the sale of shares of the capital stock of any corporation or association on margin, or to be delivered at a future day, shall be void, and any money paid on such contracts may be recovered

by the party paying it by suit in any court of competent jurisdiction."

Plaintiff's dealings with Hooker were altogether on margin; when the estimated value of the land did not afford sufficient margin, it was put up in cash and was kept good as the market fluctuated. Upon purchasing stock, the cost price was charged to plaintiff, less the amount of margin put up in cash; when sold, his account was credited with the amount realized. He was, of course, charged with the broker's commissions and the interest on the money advanced.

The result, of course, was, that plaintiff, aside from the commissions and interest, simply received or paid the differences between the buying and selling values. It was not contemplated that he should ever receive the stock, although he might, had he been able, have paid his debt and demanded the securities at any time.

Stock ordered was always purchased by Hooker, paid for in full, and delivered to him, except when he had orders to sell the same stock for another customer, in which case the stock was simply transferred from one account to the other at market rates. The account was generally balanced monthly, when, as Hooker testified, plaintiff could tell whether he had lost or won in stocks. Hooker did not keep the stock of his customers separate or preserve its identity, but always had under his control sufficient to satisfy the claims of his customers.

It is evident from these facts that the only purpose of these dealings was to enable plaintiff to speculate in the fluctuations of the market. If there were no break in the proceedings, it was indifferent to plaintiff whether any stock was bought or not, provided the entries were made in his account according to the market rates. It was quite a different matter, however, to Hooker. Had he not purchased, the transaction would have been a continuous wager between himself and his customer as to the future of the market. By purchasing he secured

himself, and had no other interest than his commissions and the interest on his money.

So, too, had there been a break anywhere in the deal, it might have been important to determine whether the stock was purchased by Hooker as agent and belonged to plaintiff, or was purchased for himself simply to make himself safe upon his contract to give plaintiff the advantage of the fluctuations of the market.

The respondent contends that the relation of vendor and vendee did not exist between plaintiff and Hooker; that they neither bought nor sold stock to each other; that Hooker, as agent for plaintiff, purchased and paid for the stock, receiving immediate delivery for plaintiff, and thereafter held it subject to his order upon the payment of the price and commissions. The further contract, by which he held it as security for a loan, constituted the relation of pledgor and pledgee, which is not prohibited by the constitution.

This view was adopted by the learned judge of the trial court, and the findings are carefully drawn upon that theory. They find that the stock was purchased by Hooker as agent of and belonged to plaintiff, and that Hooker never sold stock to or bought from plaintiff. No part of the indebtedness, therefore, arose from the sale of stock on margin or otherwise.

This view of the relation between the broker and his customer in such a transaction is sustained by the weight of authorities in this country and in England, but the decisions are by no means uniform.

The first prominent case on the point is *Markham* v. *Jaudon*, 41 N. Y. 235. The question there was, whether the stock in the hands of the broker was a pledge. In order to determine this question, an analysis is made of the contract relations, separating the powers and obligations of the parties. It was held that the broker undertook,—1. To purchase for his customer; 2. To advance the money required beyond the margin; 3. To

carry the stock, the margin being kept good, the customer to receive the gain or suffer the loss; 4. To retain the stock, or an equal amount of the same kind of stock; 5. To deliver to customer, when required, upon payment; or 6. To sell when required, accounting for the proceeds; that the customer contracts, — 1. To pay the stipulated margin; 2. To keep the margin good; and 3. To take the shares when required, and pay the amount due the broker.

This statement of the rights and obligations of the parties has been generally followed in other cases in which similar questions have arisen; and stock boards and brokers have adopted it as correctly stating the nature of the relation between broker and customer. It is evident, however, that the court in this analysis assumes the conclusion which it desired to reach. Its correctness has been questioned.

In that case there were two strong dissenting opinions, in which the relation between the broker and his customer was regarded simply as a contract relation, by which the fact of agency was ignored or denied. Mr. Justice Grover says: "The contract contemplated that the title should at all times remain in the defendants (brokers)." Mr. Justice Woodruff refers for his views of the relation to his opinion in *Morgan* v. *Jaudon,* 40 How. Pr. 366. He there states his opinion to be, that "it does not contemplate, in the first instance, that the customer shall ever acquire the title to the stock. It is a pure speculation in the rise and fall of stocks; . . . . and the broker is employed to provide the means, either from his own funds, . . . . or by borrowing in his own name and on his own credit, by pledge of the very stock which he buys, the required amount. And the whole expectation and intention of the parties is satisfied if when directed to sell he produces the required number of shares and sells them for the very purpose for which the speculation is made; viz., to realize the profits or determine the loss

which results to the party employing him for that purpose. It is entirely clear that in these transactions the party employed, though he belongs to a class commonly called ' brokers,' does not act as broker merely. In such business they are more than brokers; and all arguments imputing to them a mere agency, so far as they rest upon the facts that they are called ' brokers,' are unsound and fallacious."

In Pensylvania it has been held that the relation of principal and agent does not exist between the broker and his customer, but both are principals. (*Ruchizky* v. *De Haven*, 97 Pa. St. 202; *North* v. *Phillips*, 89 Pa. St. 250; *Dickson* v. *Thomas*, 97 Pa. St. 278; *Gheen* v. *Johnson*, 90 Pa. St. 38.)

In *Ingraham* v. *Taylor*, 58 Conn. 503, it was held that the broker under such a contract was not bound to purchase the stocks at all. It was enough if he could procure them when called for, at the market rate, when ordered. It is said: "By such contracts the plaintiff bought the right to demand, at his option as to the time, the delivery of shares at the price of the day of agreement; the defendants, in consideration of his payments upon margins, assumed the risk of an undertaking to deliver shares upon demand at that price."

These citations are made to show that it is not universally admitted that the broker in such transactions purchases the stock as the agent of the customer. Looking at it from the point of view of the customer only, it is clear that by this device he has been able to purchase stock on margin. This phrase has come to have a peculiar or technical meaning among stock dealers; and it is applied to just these transactions between broker and customer.

It is a matter of public history that the constitutional provision was adopted just after a period of remarkable stock speculation, in which a large part of the community had been set wild with the apparent prospect of

great gain, and the rapid fluctuations of stock afforded unusual inducement to stock-gambling. By skillful manipulation of the markets, a few fortunate ones had been able to take advantage of the existing *mania* and make large fortunes for themselves, at the cost of widespread financial ruin and distress. People of small means were enabled by brokers to speculate largely at that time through these very purchases on margin. Of these matters this court will take judicial notice, and doing so, cannot doubt that this inhibition was intended to strike down this practice.

If it does not do this, it simply beats the air. Although an isolated case or two might occur, where a transaction directly between vendor and vendee is upon like terms, certainly we know there was no practice of that kind which could have been regarded as an evil of sufficient importance to be prohibited in the fundamental law.

Such a prohibition is of little worth if it can be evaded by so simple a device. A party wishing to purchase on margins has but to interpose his broker, who is to carry the stock, instead of the original owner. This would not diminish the evil. In fact, it is the very form of the evil mainly intended to be prohibited. It may be said that if the relation be not one of principal and agent, but simply a contract relation by which the broker agrees to speculate in stocks, the customer indemnifying him against loss, and taking the profits, still there is no sale. It would be, it may be said, a contract to enable the customer to speculate in differences of market values. It is only sales on margin that are prohibited and made void.

It is not easy to characterize by a name the relation between the broker and his customer. For all ordinary purposes it may be admitted that the broker purchases as the agent of his customer, and then holds the stock as a pledge to secure a debt; but if by the transaction the customer is enabled to do that which is prohibited,

to wit, purchase stock on margin, it must be held to be within the prohibition, and if Hooker did not himself sell to plaintiff, but was only the instrument through whom the illegal end was accomplished, he being privy to the design, the same result would follow. (*Irwin* v. *Williar*, 110 U. S. 510.) In the accomplishment of the unlawful purpose he took the place of the vendor, and carried the stock as the vendor might have done; and the end was thus reached *per interpositam personam.* The end attained, and not the form of the transaction, must determine the question.

It is claimed that it does not appear that the stock was the capital stock of a corporation or an association; but it is so found, and the respondent is in no position to complain of the finding.

We think the court erred in holding, from the evidence, that plaintiff was indebted to Hooker or his assignee. We therefore recommend that the order and judgment be reversed, and a new trial ordered.

FOOTE, C., and FITZGERALD, C., concurred.

The COURT.—For the reasons given in the foregoing opinion, the order and judgment are reversed, and a new trial ordered.

Hearing in Bank denied.