[No. 15237. In Bank.—June 29, 1894.]

# ANNE M. SHEEHY, RESPONDENT, v. HOWARD H. SHINN, APPELLANT.

SALE OF STOCKS ON MARGIN—FUTURE DELIVERY—CONSTRUCTION OF CONSTITUTION—QUESTION OF LAW—EVIDENCE.—The court must decide the question, as matter of law, as to what the framers of the constitution intended by the provision of section 26 of article 4, to the effect that "all contracts for the sale of shares of the capital stock of a corporation or association, on margin, or to be delivered at a future day, shall be void, and any money paid on such contracts may be recovered by the party paying it by suit, in any court of competent jurisdiction," and the construction of this provision does not depend upon the evidence of the witnesses in a particular case as to what the terms "on margin, or to be delivered at a future day," mean, according to the usage of brokers and other dealers in stocks during the years immediately preceding the adoption of the new constitution.

ID.—JUDICIAL NOTICE—LEGAL TERMS.—The courts take judicial notice of the true meaning of all legal expressions, including all the terms used in the constitution or in acts of the legislature.

ID.—SELF-EXECUTING PROVISION—VOID CONTRACTS—JURISDICTION.—The provision of section 26 of article 4 of the constitution of 1879 is self-executing, needing no act of the legislature to give it its intended effect; and contracts of the class designated are rendered void by the constitution itself, and money paid in pursuance of them is recoverable by actions commenced in the superior or justice's court, according as the amount claimed is more or less than $300.

ID.—MEANING OF "MARGIN"—RETENTION OF STOCK AS SECURITY—
RIGHT OF SALE.—The word "margin" as most frequently employed in
this state at the time of, and for many years prior to, the adoption
of the constitution, meant the sum deposited by a purchaser of stock
with his broker paying a certain percentage of the purchase price of
the stock, the broker agreeing to advance the balance of the purchase
price upon condition that he should hold the stock as security for his
advances, with the right to sell it in case of depreciation in value and
failure of the purchaser to keep the margin good ; and this is the sense
in which the word was used by the framers of the new constitution.

ID.—SALE ON MARGIN AND FOR ^FUTURE DELIVERY.—An agreement for
the sale of stock upon payment of a part of the agreed price, the stock
to be retained by the vendor as security for the balance, and only to be
delivered upon such payment, with the right of the vendor to sell it at
any time, without notice to the vendee, if it so depreciates in the market
as to be worth less than three times the unpaid balance, is a sale of
stock on margin and for future delivery.

ID.—EVASIVE FORM—PURCHASE BY BROKER FOR ACCOUNT OF CUSTOMER—
AGENCY—RETENTION OF TITLE AND POSSESSION.—A broker cannot
make and enforce sales of stocks on margin and for future delivery, and
retain the payments made under such contracts, by the evasion of
going through the form of buying from a third party for the account
of the purchaser, as his attorney in fact, when by his contract he has
made elaborate provision that the title to the shares shall remain in
himself, and never pass to the purchaser until full payment is made.

ID.—EVASION OF CONSTITUTION.—To give effect to the constitution it is as
much the duty of the courts to see that it is not evaded, as that it is
not directly violated; and where the transaction appears to be a
dealing in stocks on margin in substance, the fact that another name
is given to the transaction will not have the effect to make it valid.

ID.—LEGITIMATE TRANSFER OF STOCK—PLEDGE FOR BORROWED MONEY.—
The rule against the sale of stocks on margin does not prevent any
legitimate transfer of stock, whether through the agency of a broker
or otherwise, nor any legitimate and *bona fide* pledge of stock certifi-
cates as security for borrowed money, whether borrowed for the pur-
pose of paying for the stock or any other purpose; and where such
is not only the form, but the substance, of the contract, the inhibition
of the constitution does not apply.

ID.—SHARES FULLY PAID FOR AND DELIVERED.—Where shares pur-
chased by the broker are fully paid for, and the certificates delivered,
the purchaser can recover nothing on account of them.

ID.—PRESUMPTION UPON APPEAL—SUPPORT OF JUDGMENT.—The presump-
tions upon appeal are in favor of the judgment, and no error can be
assumed in favor of either party as against the judgment.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco.

The facts are stated in the opinion of the court.

*William F. Herrin,* and *Robert Y. Hayne,* for Appellant.

*Cashman* v. *Root,* 89 Cal. 373, 23 Am. St. Rep. 482, seems to be based upon the " spirit of the constitution," which is an uncertain guide for the courts. (*Pattison* v. *Supervisors,* 13 Cal. 182; *Stockton etc. R. R.* v. *Stockton,* 41 Cal. 162.) The debates on the constitution show that the provision respecting sales of stock on margin was designed to prevent what were known as "bucket shops," or swindling sales, where the seller had no stock in possession, but the parties were merely betting upon the rise or fall of the price of stocks within a given number of days. (2 Debates on the Constitution 807–09.) The writer of the opinion in *Cashman* v. *Root,* appear to have confused the American rule as to gaming contracts with the constitutional provision which he was construing. The question in cases as to gaming contracts turns on the intentions of the parties. (*Irwin* v. *Williar,* 110 U. S. 499; *Kirkpatrick* v. *Bonsall,* 72 Pa. St. 158; *Cockrell* v. *Thompson,* 85 Mo. 510; *Williams* v. *Carr,* 80 N. C. 298.) The case at bar is distinguishable from *Cashman* v. *Root,* 89 Cal. 373, 23 Am. St. Rep. 482, in that it shows a genuine transaction of purchase of stock, for which part of the price was paid by the broker and the stock held as security. When a contract for future delivery was *bona fide* and valid in its inception, and not tainted with any gambling intent, subsequent default of one of the parties, and a settlement upon the basis of difference between the contract price and the market value, will not render the contract void. (*Wall* v. *Schneider,* 59 Wis. 352; 48 Am. Rep. 520; *Clarke* v. *Foos,* 7 Biss. 558; *Sawyer* v. *Taggart,* 14 Bush, 734; *Conner* v. *Robertson,* 37 La. Ann. 814; 55 Am. Rep. 521; *Roundtree* v. *Smith,* 108 U. S. 275, 276.)

*John P. O'Brien,* for Respondent.

The case of *Cashman* v. *Root,* 89 Cal. 373, 23 Am. St. Rep. 482, is conclusive of this case.

BEATTY, C. J.—This is an action founded upon the following clause of section 26 of article IV of the constitution of 1879:

"All contracts for the sale of shares of the capital stock of any corporation or association, on margin, or to be delivered at a future day, shall be void, and any money paid on such contracts may be recovered by the party paying it by suit in any court of competent jurisdiction."

The plaintiff sues to recover money alleged to have been paid to defendant upon contracts for the sale of stocks "on margin." The cause was tried in the superior court without a jury, and on the facts found judgment was given for the plaintiff for $648 and costs. From this judgment both parties appeal, the plaintiff contending that on the findings the judgment in her favor should have been for about $1,200, and the defendant insisting that the decision of the superior court is contrary to the evidence set out in his bill of exceptions, and also that the specific findings of fact are inconsistent with the general finding to the effect that the transactions between him and the plaintiff "were sales of stock of incorporated companies on margin, or to be delivered at a future day," upon which finding the judgment against him is based.

We are of the opinion that our decision in both appeals must depend wholly upon the proper construction of the findings of the superior court, and of the constitutional provision above quoted. The evidence contained in the defendant's bill of exceptions relates exclusively to the meaning of the terms "on margin," "future delivery," etc., according to the usage of brokers and other dealers in stocks at San Francisco during the years immediately preceding the adoption of the new constitution, and, although it has been carefully read and considered, it can only be regarded as one, among various sources of information, to which the court may resort for the purpose of ascertaining a fact of purely judicial cognizance. Whatever may have been

the evidence in the superior court, and whatever effect
it may have been allowed, this court must now decide,
as matter of law, what the framers of the constitution
intended by the terms they have employed; and this
construction does not depend upon the evidence of the
witnesses in a particular case, for if it did we should be
compelled to affirm one construction in one case, and a
different construction in another case—an absurdity
which can only be avoided by giving effect to the rule
that courts take judicial notice of the true meaning of
all legal expressions (Code Civ. Proc., sec. 1875), and
this, of course, includes all the terms used in the con-
stitution or in acts of the legislature.

Looking, therefore, to the evidence in this case only
so far as we may find that it affords us some aid in
arriving at the actual intention of the framers of the
constitution, we proceed to inquire what that intention
was.    For this purpose the language of the constitution
is necessarily the first thing to be considered, and if its
meaning is plain, there is no occasion to resort to extra-
neous aids.    With respect to the clause under consider-
ation, it does not seem to be very obscure in its terms
or intent.    It declares that certain contracts shall be
void, and that any money paid in pursuance of them
may be recovered back by the party paying it in any
court of competent jurisdiction.    The provision is evi-
dently self-executing, needing no act of the legislature
to give it its intended effect.    Contracts of the class des-
ignated are rendered void by the constitution itself, and
money paid in pursuance of them is recoverable by
actions commenced in the superior or justice's courts,
according as the amount claimed is greater or less than
$300.    The only question of construction which can
possibly arise is upon the meaning of the phrase "on
margin, or to be delivered at a future day," but even as
to this there is little difficulty so far as the present case
is concerned.    There are some transactions which are
clearly and plainly within the designated class, although
there are others with respect to which it may be doubt-

ful whether they are included or not. The meaning of the word "margin," as ordinarily used in connection with stock sales, has long been well understood. As most frequently employed in this state at the time of, and for many years prior to, the adoption of the constitution, it meant the sum deposited by a purchaser of stock with his broker, being a certain percentage of the purchase price of the stock, the broker agreeing to advance the balance of the purchase price upon condition that he should hold the stock as security for his advances, with the right to sell it in case of depreciation in value and failure of the purchaser to keep the margin good. This, we say, was the sense in which the word was most frequently employed, but it was also employed to describe deposits made by sellers and purchasers of stock for future delivery upon a variety of conditions, and in various ways which need not be considered here. It is enough for all the purposes of this case to say that whenever the purchaser of stock paid to the vendor of the stock, or to his broker, a percentage of the purchase price upon an agreement that the stock should be held as security for the balance, the amount so paid was "margin" in the sense in which the term was used by the framers of the new constitution. If the mere language of the instrument did not make this sufficiently manifest, it is made so by reference to the arguments of both the advocates and opponents of the provision in the constitutional convention (2 Debates on the Constitution, 806–10) and by the evidence in this record.

This being so, it follows that an agreement between vendor and vendee, for the sale of stock upon payment of a part of the agreed price, the stock to be retained by the vendor as security for the balance, and only to be delivered upon full payment, with the right in the vendor to sell it at any time, without notice to the vendee, if it should so depreciate in the market as to be worth less than three times the unpaid balance, is a sale of stock on margin and for future delivery.

That such was the agreement between the plaintiff

and defendant in this case, and that he, the defendant, though nominally a mere broker for the plaintiff, was in reality her vendor, is, in effect, the finding of the superior court as a conclusion, not of law, but of fact, and upon this fact the judgment is based. Unless, therefore, the more specific findings of fact are inconsistent with this general finding, the right of the plaintiff to recover the amount paid by her upon such margin sales cannot be denied. To determine whether there is any such inconsistency it will be convenient to quote the more material portions of the findings in full. They are as follows:

"Between the first day of April, 1890, and the first day of July, 1891, the defendant was a stock broker, engaged in business as such, in the purchase and sale for customers at the city and county of San Francisco, of the stocks of incorporated companies. That on the tenth day of April, 1890, the plaintiff opened an account with the defendant as such broker, and from that time onward until about July 1, 1891, continued said account with him and to transact business with him as such broker, having him purchase and sell for her account with him stocks of incorporated companies, as such broker.

"That on each occasion that the plaintiff ordered defendant to buy or sell any of such stock, as aforesaid, she made, signed, and delivered to him a written order therefor in the following form:

" ' *Howard H. Shinn, Member S. F. Stock Exchange Board,*
" ' *Stock Broker, No. 318 Pine Street.*

" ' Will buy and sell stocks for cash, with the express understanding that all stocks purchased, or which are held by him as collateral, may be sold by him in his discretion at any time, without any demand upon the customer for the payment of the balance of account then due, or without any demand whatever, or without any notice of the time or place of said sale, and without any notice whatever, at the " San Francisco Stock and Exchange Board," at any regular or informal session

thereof, or at private sale whenever the lowest market value of such stock or stocks is less than thrice the amount of such balance of account due him by the customer, or whenever, in his judgment, the stock is liable to depreciate so as to make the security insufficient; and if such sale or sales do not cover such balance of account, then the undersigned will pay the remainder with interest; and any taxes levied on such indebtedness, or on the securities held as collateral, shall be charged to the account and become a part thereof. Rates of interest to be $1\frac{1}{2}$ per cent per month, compounding monthly. When stocks are borrowed or sold on account of the undersigned, H. H. Shinn has the right to buy such stocks without any demand upon, and without any notice to, the customer, on street or in said " San Francisco Stock and Exchange Board," at any regular or informal session thereof, whenever he thinks he has not sufficient money or security on hand to protect himself against loss. H. H. Shinn shall not be required to keep on hand the identical certificates of stock purchased or pledged, but it shall be sufficient if they have the same number of shares of stock to deliver when properly deliverable and properly called for; all customers' stock on hand shall be held as collateral for customers' entire account. If at any time the funds in the hands of H. H. Shinn, belonging to the customer, are insufficient to pay the purchase price of any stock purchased for him, then H. H. Shinn, if he sees fit to do so, may advance the deficiency, and the money so advanced shall immediately become due and payable from the customer to him, and if not immediately paid without demand, he shall have the right at any time after such advance to sell any or all stocks in his hands, without notice or demand upon said customer, to repay such balance, such sale to be made in the manner hereinabove provided. All stocks purchased or held under this agreement may be placed absolutely in the name of any person selected by H. H. Shinn. This agreement shall not be varied by any oral agreement, but can only be varied by a

written agreement indorsed hereon and subscribed by the parties hereto; stocks bought and delivered as received to customers at their risk, unless transferred at office.    H. H. Shinn is hereby constituted and appointed my attorney in fact, to purchase or sell stocks for my account in accordance with the foregoing conditions, and his signature to this order as a contract between us is hereby expressly waived.    For value received, I hereby agree that the foregoing terms and conditions do and shall apply to and govern all future transactions and accounts with the undersigned, unless varied by a subsequent written agreement.

"'SAN FRANCISCO,................1890.

"'Please.........for my account and risk, subject to the above terms, and also subject to the rules of the San Francisco Stock and Exchange Board:..........
This order good for street, or any session, until........
(unless time is expressed, orders good until countermanded.)'

"The foregoing is one of the orders given, all of which were in the same form, with the insertion in the particular order of the word 'buy,' or the word 'sell,' as the case required, and the particular stock and number of shares intended to be bought or sold.    Each order was signed by the plaintiff and delivered to, and accepted by, the defendant.

"The course of dealing and the proceedings upon such orders and said account were as follows:

"Upon receipt of the order the defendant, in all cases, went into the next meeting of the stock board, and bought or sold the stock requested for the account of the plaintiff.    The stock so purchased was always actually delivered by the seller to the defendant for the plaintiff's account on the day following the purchase, and upon such delivery the whole purchase price was paid by the defendant to the seller.    In some instances the plaintiff furnished to the defendant the whole purchase price of the stock ordered to be purchased.    In such cases the stock was actually at once delivered to

her, or she was notified by defendant that it was at her disposal when she chose to call for it, whereupon she sometimes called for such stock at once, and sometimes left it for a few days in the hands of the broker, and then took it away.  But in some of the instances, though the particular stock was paid for, the defendant claimed and asserted a right to hold it under his contract as security for the general balance due upon plaintiff's general account with defendant as such broker, which account existed at all of the times aforesaid, and as hereinafter shown.

"In the general account which defendant, as such broker, opened with plaintiff and conducted through the aforesaid period, there were in general daily transactions of purchases and sales, and often many of such transactions on the same day, either purchases or sales, or both, for said account, throughout said period during which said account was continued as aforesaid, and the defendant, in order to keep plaintiff advised of the state of said account, furnished her a pass book in which he entered the particulars, showing the different transactions in said account as they occurred; namely, on the debit pages of said pass book was entered by defendant the date of each purchase, with the kind and number of shares purchased and the price paid for the stock; also the commissions charged by defendant for executing the order; also any moneys which defendant paid to plaintiff directly out of said account, and the date of its payment; also monthly, at the end of each month, the amount of interest charged by defendant on any balance of said account in his favor during that particular month.  And on the credit pages of said pass book were entered the date of each sale of stock, with the number of shares and kind of stock sold, the price obtained therefor, and the commissions charged by defendant for executing the order; also the different amounts of money which plaintiff paid to defendant to be applied, and which defendant received from plaintiff

directly and applied on said account, with the date of its payment.

"When, during said account, plaintiff executed to defendant an order as aforesaid to buy a particular lot of said stock for her said account, he bought the stock so ordered on the day of the date of the order, and on the following day the stock was delivered to him by the seller, and thereupon defendant furnished and paid to the seller the price of the stock so bought, and thereupon the defendant received from the seller the said stock, and held the same under the provisions of the agreement above set forth, and defendant charged to plaintiff's said account in said pass book the amount advanced on her account to make said purchase, and also the commissions charged by him for executing the order. In the cases where the order was to sell, the defendant, on the day of the date of the order, sold the stock so ordered sold, and the following day he furnished and delivered it to the purchaser, and received from the purchaser the price obtained, and defendant thereupon entered to plaintiff's credit in said account in said pass book, the amount so received by him, less his commissions for executing the order.

"From time to time during said account defendant paid to plaintiff out of said account sums of money, and upon making any such payment he made entry in said pass book on the debit side of the amount so paid, with the date of its payment.

"From time to time during the continuance of said account defendant made calls upon plaintiff, requiring her to pay him money or further security on said account to keep the balance of said account due him within the limits as agreed in said orders; namely, so that the market value of the stocks and security in his hands on said account should be equal to thrice the amount of such balance due him on the said account, and plaintiff, at various times, and for that purpose, paid to defendant on said account sums of money, and upon any such payment being made the defendant

entered the amount and date thereof to plaintiff's credit in said account, on the credit side of said pass book.

" The aggregate monthly purchases of stocks on said account with the expenditures made by defendant therefor, also the aggregate monthly sales and receipts therefor in said account, are given below, and also below is set out the items with amounts and dates of money either paid by defendant to plaintiff out of said account, or paid by plaintiff to defendant on said account as above stated.

" It was always understood that the plaintiff could at any time have possession of the stock purchased as aforesaid, upon payment to the defendant of the full sum due on her account, as above stated; but, on the other hand, it was always understood that the stock should be held by defendant as security, as above stated, until all of plaintiff's obligations on the account should be paid to defendant, or the stock should be disposed of to satisfy the same; and in all these cases the plaintiff never saw the stock.

" In all cases, at the time when the orders were given and the advances and purchases made, the plaintiff intended to buy and sell (as the case might be) the stock she ordered to be bought or sold, and intended that the defendant should actually purchase or sell it, and should hold it, when bought, subject to her orders, but subject also to his rights of security upon it for his advances, interest, and commissions, and all plaintiff's obligations to him; and the defendant had the same intention; and it was understood that plaintiff could buy or sell what stocks she pleased on said account, so long as she kept the security sufficient in defendant's hands. In many of the cases the plaintiff ordered the defendant to sell stock held by him for her as aforesaid in the course of said account, and in such cases the defendant went into the market and sold the stock in pursuance of the order, receiving and crediting the plaintiff's account with the proceeds.

"In some cases, for purposes of convenience, the defendant substituted one certificate of stock for another of an equal number of shares of the same kind of stock, but always kept on hand for the account of the plaintiff the requisite number of shares of the particular stock. Such substitutions were in accordance with the agreement of the parties and the usages of the business."

The succeeding findings set forth in detail payments by and to plaintiff, the purchases and sales of stock, the prices paid and realized, the commissions and interest charged, etc., from which it appears that the plaintiff paid in during a period of fourteen months the sum of $3,034.35, and drew out $1,441, leaving a balance in her favor of $1,593.35; that the defendant bought 7,870 shares, and sold 7,530 shares—i. e., he bought 340 shares more than he sold—which, presumably, were the shares fully paid for and delivered to plaintiff.

Then comes the general finding, to which reference has been made, as follows:    " But the court finds that the transactions between plaintiff and defendant, as shown on said account, in which a part only of the purchase price was advanced by defendant, and the stock retained by him, as aforesaid, were sales of stock of incorporated companies on margin, to be delivered at a future day."

Here, as above stated, the court finds as a fact that the transactions between the plaintiff and defendant were, in substance and effect, a sale of stocks on margin and for future delivery, and the question is whether this conclusion is invalidated by the more specific findings, which precede it.    We do not find any inconsistency.    It is not to be denied that the defendant did all that was possible to give to the transactions between him and the plaintiff the form and color of dealings between her and third parties, in which he was a mere agent, but it is equally true that the court might properly find, from the terms of their contracts and their course of dealing, that the form under which they sought to conduct the business was one thing, and its substance a different thing.

Counsel for defendant, in their argument, lay great stress upon the provision of the contract that " all customers' stock on hand shall be held as collateral for customers' entire account," and upon the findings that on every order of plaintiff defendant actually went into the next meeting of the stock board, and bought the stock for plaintiff's account, paid for it in full, and had it actually delivered by the seller for plaintiff's account, and held it under the provisions of the agreement above set forth; that " in all cases, at the time when the orders were given and the advances and purchases made, the plaintiff intended to buy or sell (as the case might be) the stock she ordered to be bought or sold, and intended that the defendant should actually purchase or sell it, and should hold it, when bought, subject to her orders, but subject also to his rights of security upon it for his advances, interest, and commissions, and all plaintiff's obligations to him; and the defendant had the same intention. In some cases, for purposes of convenience, the defendant substituted one certificate of stock for another of an equal number of shares of the same kind of stock, but always kept on hand for the account of plaintiff the requisite number of shares of the particular stock. Such substitutions were in accordance with the agreement of the parties." But none of these things are inconsistent with the conclusion that the real transactions between the plaintiff and defendant were sales on margin by him to her, except in those instances where she paid in full and received the stock. The fact that by the contract it was stipulated that all customers' stock should be held as collateral, etc., amounts to nothing when you can see from other portions of the contract that the customer would never, in fact, become the owner of any stock not fully paid for. Nor is it any thing to the purpose that defendant actually bought the stock ordered, paid for it, and received it for the account of the plaintiff. It is quite consistent with a sale by him to her that he should do all these things. By buying the stock he would protect himself from loss

in case of a rise, and the margin of 66⅔ per cent, which, by the terms of the contract, she was obliged to keep good (though the word "margin" is not used) would protect him from loss in case of a fall.   The purchase and delivery of the stock for her account would be a mere formality, meaningless and delusive, in view of the provisions of the contract, which left him the practical owner of it, and deprived her not only of all the rights ordinarily pertaining to ownership, but of all the ordinary rights of a pledgor.   By the express terms of the contract she was never to acquire the title to any specific shares until they were fully paid for and delivered. As to all other shares, she was merely to have a credit on account for a certain number, the title and possession of the certificates remaining in the defendant with absolute right of disposition whenever the margin was not kept good.

Nor is it inconsistent with a sale from defendant to plaintiff that she intended to buy the stock which she ordered, and that he should buy it and hold it subject to her orders and his own rights under the contract, and that he had the same intention, and that he always kept on hand the requisite number of shares.   She, of course, intended to buy the stock on margin, subject to all the contingencies provided for in their agreement, and he intended that she should have it subject to the stipulated conditions, but until those conditions were performed he was substantially the owner of the stock and the certificates.   She was not the owner, and was never to become the owner unless she paid for them. Counsel, of course, would not contend that a contract for the sale of stocks on margin and for future delivery would be placed beyond the reach of the constitutional provision by the mere fact that the seller under such a contract purchases the stock from a third party, and holds it pending the time given to complete the sale, but they are contending that the court should shut its eyes to all the *indicia* of the real nature of these transactions, and treat them as if they were in fact what the parties have

chosen to call them. But this we cannot do. The provision of the constitution was aimed at the substance of these abuses, and not at the form. Its framers meant to put an end to the stock gambling then prevalent, and for this purpose declared void all margin sales, or sales for future delivery. To hold that a broker may make and enforce such sales, and retain the payments made under such contracts, by the simple device of going through the form of buying from a third party for the account of the purchaser, when by his contract he has made elaborate provision that the title to the shares shall remain in himself, and never pass to the purchaser until full payment is made, would render the provision in question utterly nugatory. To give effect to the constitution it is as much the duty of the courts to see that it is not evaded as that it is not directly violated. This is the principle of the decision in *Cashman* v. *Root*, 89 Cal. 373, 23 Am. St. Rep. 482, a case which cannot be distinguished from this in any essential particular. Counsel attempted to establish a distinction by pointing to the fact that in that case the defendant expressly admitted that the object of the transaction there in question was a course of dealing in stocks on margin. But what was there admitted in terms, is here amply established in substance, the name only being suppressed. It would indeed have been sufficient to have affirmed this judgment on the authority of that decision, but the importance of the subject, and the numerous cases which have arisen, or may arise, out of similar dealings, has induced us to reconsider the whole question and the arguments advanced by counsel not only in this case, but in a number of other cases pending here which involve a similar state of facts. After such reconsideration we are entirely satisfied that the decision in *Cashman* v. *Root*, 89 Cal. 373, 23 Am. St. Rep. 482, was right, and that it must stand. We are, at the same time, convinced that it involves none of the mischiefs which counsel insists will flow from it. It will not prevent any legitimate transfer of stock,

whether through the agency of a broker or otherwise, nor will it prevent any legitimate and *bona fide* pledge of stock certificates as security for borrowed money, whether borrowed for the purpose of paying for the stock or any other purpose. Where such is not only the form, but the substance, of the transaction, the inhibition of the constitution does not apply.

With respect to the defendant's appeal, to which we have thus far confined our attention, our conclusion is that the judgment must be affirmed. The plaintiff's appeal demands but little consideration. She contends that on the finding, she is entitled, as a simple matter of book-keeping, to a judgment for the difference between what she paid defendant and what she received from him, and her counsel states the balance at $1,243.75. As a simple matter of book-keeping the balance seems to us to be $1,593.35, but the right of plaintiff to demand that amount is not so clear. The findings show that defendant purchased 340 shares more than he sold, and also that for some shares plaintiff made full payment and received the certificates. It is entirely consistent with the findings to assume that the price of these full-paid shares makes up the difference between the balance claimed and the amount allowed by the superior court, viz: $602. If it be contended that we have no right to assume this as against the plaintiff, it may be replied that we have no right to assume any thing else against the defendant. The judgment is in her favor, and the findings must support it. Really, they do not show *conclusively* that she was entitled to recover as much as $602, and it is only by the presumptions in its favor that the judgment can be sustained at all.

The judgment is affirmed.

FITZGERALD, J., and GAROUTTE, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment and in the opinion of Chief Justice Beatty. I see no other possible construction of the constitutional pro-

vision in question. It is proper to remark, however, that the judiciary cannot avoid the consequences of a provision of *constitutional* law which allows a party to a contract to profit by it as long as it pays, and to repudiate it by boldly ignoring his solemn obligations as soon as it begins to show loss.

Mr. Justice Van Fleet not having heard the argument herein, and Justices Harrison and De Haven being absent, did not participate herein.

Rehearing denied.