[Civ. No. 823. Fourth Appellate District.—July 19, 1933.]

D. L. GRIFFIN, Respondent, v. DELLA MYRTLE PAYNE, as Administratrix, etc., Appellant.

Everts, Ewing, Wild & Everts, Dan F. Conway and L. N. Barber for Appellant.

Ackerman, Wayland & Matthews and Sutherland, Dearing & Jertberg for Respondent.

MARKS, J.—Plunkett-Lilienthal and Company is a copartnership with its place of business in the city and county of San Francisco, transacting a general brokerage business, and is a member of the San Francisco Stock Exchange. Before the commencement of this action it assigned its demand against Le Roy Payne, now deceased, to respondent for collection.

During the year 1928 Le Roy Payne purchased different stocks through the agency of respondent's assignor, paying cash for the securities and accepted deliveries of them. In

the latter part of the year he had a conversation with one Sidney Clark, an employee of the assignor, in which trading in stocks on a margin was discussed. This resulted in Payne and the assignor entering into a written agreement that the assignor would act as broker for Payne in dealing in stocks on a margin. It appears that for a number of months after the execution of this contract Payne had on deposit with his brokers sufficient money and securities so that all of the stocks which he had purchased could have been more than paid for without the sale of any of the stocks purchased on margin. Several months after January 1, 1929, Payne increased his operations so that his deposit of stock and money with his brokers was not sufficient to pay for the stocks purchased for him without disposing of some of them. Up to the latter part of July, 1929, the brokers only purchased such stocks as Payne directed either in person or over the telephone. About this time, Payne, who was a resident of the city of Fresno, took a trip and was gone until the latter part of August of the same year. Before leaving he authorized his brokers to use their discretion in purchasing stock for him upon margin, which they did during his absence. He testified that upon his return he informed Clark to discontinue this practice. Clark could not recall any such instruction. On September 6, 1929, the brokers purchased fifty shares of "Curtis-Wright" for $1318.75, and fifty shares of "Standard Brands" for $1975, and on September 25th, fifty shares of "General Gas & Electric A" for $5,200, all without the prior knowledge of Payne. They notified him by telegram of the purchase of the two stocks on September 6th and also sent a memorandum of purchase by mail. A similar memorandum of purchase was sent at the time of the purchase of the General Gas & Electric stock. On or about the last of each month they sent by mail a detailed statement of all transactions on his account for that month. He made no objection to the purchase of the three stocks just mentioned until November 14, 1929, after their market value had decreased as a result of the stock market crash in October of that year. Frequent demands were made upon Payne by his brokers after October 23, 1929, that he deposit with them additional cash or securities to protect his margin. This he refused to do and in June, 1930, his brokers sold all his stocks and applied the selling

price to his account and this suit was brought to recover the deficiency. Judgment was rendered against Payne for the sum of $6,039.94, from which this appeal is taken.

The margin contract executed by Payne on November 26, 1928, was as follows: "The undersigned, the customer, agrees with Plunkett and Lilienthal and Co., the broker: a. That all transactions for, or in connection with the account of the customer, shall in all respects be subject to the rules and customs of business of the San Francisco Stock and Bond Exchange, and its Clearing House, or of any other Exchange or Board of Trade on which such transactions may be executed. b. That all transactions for or in connection with the account of the customer shall be deemed to be included in a single account, notwithstanding the fact that such transactions may be segregated into separate accounts on the books of the broker. c. That all securities from time to time carried in the customer's marginal account, or deposited to protect the same, may be loaned by the broker, or may be pledged by the broker, either separately or together with other securities, either for the sum due thereon, or for a greater sum, all without further notice to the customer. d. The customer agrees upon demand, to deposit any additional margin required by the broker and in case of his failure so to do, or whenever, without any demand for more margin, the margin on the account of the customer shall become reduced to less than five per cent (5%), or whenever in the judgment of the broker, it is necessary for his protection, the broker shall have the right to close the account or any trade or transaction included therein on the San Francisco Stock and Bond Exchange, or elsewhere, or at public or private sale, all without further notice to the customer."

The practice of San Francisco brokers in handling margin accounts where the stock was listed and sold on the San Francisco Stock Exchange may be briefly summarized as follows: When the order was received from a customer he was required to deposit with his broker the difference between the selling price of the stock and the amount banks would lend upon it as collateral. The broker bought the stock upon the San Francisco Stock Exchange. At the close of business the transaction was recorded in the books of the Exchange and the following day the broker received the

purchased stock. He either pledged the stock with his bank as security for a loan to pay the balance of the purchase price or carried the loan himself, retaining the stock as collateral. The stock thus transferred was what was called "Street Certificates". These were ordinary stock certificates indorsed in blank by the shareholder with the indorsement guaranteed by some responsible bank or broker. So indorsed they were regarded as negotiable and passed from person to person without further indorsement until such time as a delivery was made to a customer who had purchased and paid for them. The broker was required to keep in his possession, or pledged, a total number of the shares of stock of the corporation equal to the total number of shares purchased by him for the accounts of all of his customers dealing in such stock on a margin, so that when a customer paid for his stock and desired its delivery the transaction could be closed by delivering the number of shares purchased on margin, although the certificate delivered to him might not have been for the identical shares which the broker purchased at the time he executed the customer's order.

Where the broker was not a member of the New York Stock Exchange, and the stock purchased by the customer was not listed on the San Francisco Stock Exchange, the broker would execute the order through a San Francisco representative of a broker having a seat on the New York Stock Exchange. The "street stock" was not delivered to the broker for the customer, but was held by the member of the New York Stock Exchange or his correspondent to secure the account of the customer's broker, or it might have been pledged by the member of the New York Stock Exchange with his bank to secure that portion of the purchase price paid for the stock on such exchange by its member broker. Payne's brokers were not members of the New York Stock Exchange.

Appellant urges two grounds for a reversal of the judgment. First, that the margin contract under which the stock was purchased by the brokers was illegal and void under the provisions of section 26 of article IV of the Constitution of California; second, that because the three purchases of stocks in September, 1929, were not expressly authorized by Payne, his account cannot be charged with them. She maintains that if her first contention is sustained, respondent cannot re-

cover; and if her first contention is not sustained and her second contention is sustained, the judgment should be reduced to $961.75.

In support of her first contention appellant cites section 26 of article IV of the Constitution and the cases of *Cashman* v. *Root,* 89 Cal. 373 [26 Pac. 883, 23 Am. St. Rep. 482, 12 L. R. A. 511]; *Sheehy* v. *Shinn,* 103 Cal. 325 [37 Pac. 393]; *Kullman* v. *Simmens,* 104 Cal. 595 [38 Pac. 362]; *Parker* v. *Otis,* 130 Cal. 322 [62 Pac. 571, 927, 92 Am. St. Rep. 56]; *Stillwell* v. *Cutter,* 146 Cal. 657 [80 Pac. 1071]; *Hartnett* v. *Wilson,* 31 Cal. App. 678 [161 Pac. 281]. The section of the Constitution in question was amended in 1908. All of the cases cited, except *Hartnett* v. *Wilson, supra,* were decided under the language of the section prior to this amendment and are therefore of little assistance in the decision of the question involved.

The original section was apparently intended to prevent marginal transactions on a stock exchange and transactions where an immediate delivery of the stock was not had. The amended section prohibited fictitious transactions on the stock exchange where there was no intention on the part of the customer and the broker to deliver the stock, and where the parties contemplated mere payment of the difference between the contract and the market price on divers days.

In the case of *Hartnett* v. *Wilson, supra,* the trial court held there was no intention on the part of either the customer or the broker to deliver the stock in question, and that therefore it was a fictitious marginal transaction and prohibited by the constitutional provision as amended in 1908. In the instant case the trial court made a contrary finding. It was here found that there was an intention to deliver the stock purchased. This sufficiently distinguishes the two cases so that the rule announced in *Hartnett* v. *Wilson, supra,* is not applicable here.

The case of *Willcox* v. *Edwards,* 162 Cal. 455 [123 Pac. 276, 278, Ann. Cas. 1913C, 1932], involved the purchase price on margin of shares of stock on an exchange by a broker for a customer before the amendment of the section of the Constitution under consideration, and a decision after the amendment became effective. Therefore, the discussion of the effect of the amendment in this opinion must, strictly speaking, be considered *dicta.* However, as it appears that

the case was first heard in department and a rehearing granted for the express purpose of considering the effect of the amendment, this *dicta* would seem to be the result of careful study of the question. After quoting the original and amended sections, it was said: " 'The concluding sentences of the respective sections show the changes made by the amendment which are involved in this action. The original section gives the broader description of the thing prohibited. It forbids all contracts for the sale of stock "on margin, or to be delivered at a future day". The new section forbids such sales only when they are made "without any intention on the part of one party to deliver and of the other party to receive the shares, and contemplating merely the payment of differences between the contract and market price on divers days". The contract between Sisson and Edwards, as it is alleged, was clearly a contract for the purchase and sale of stocks on margin (see *Parker* v. *Otis,* 130 Cal. 330 [92 Am. St. Rep. 56, 62 Pac. 571]), and as such was forbidden by the constitutional provision in force at the time it was made. But the allegations of the complaint do not show a contract which comes within the description of the thing forbidden by the amended section. The complaint does not aver that the sales were made without any intention to deliver or receive the stock, or that the parties contemplated merely the payment of differences between the buying price and the market price on a future day. Both the old and the new section declare that the forbidden contracts "shall be void". The contract as alleged was void under the old section, the one then in force, but it would not have been void under the new section, if it had been made after its adoption.' "

The case of *Cisler* v. *Ray,* 213 Cal. 620 [2 Pac. (2d) 987, 989, 79 A. L. R. 584], presents facts quite similar to the one at bar. Ray was a customer of a broker member of the San Francisco Stock Exchange, the assignor of Cisler. Ray maintained a margin account with the broker who executed his orders on the floor of the exchange. The action was brought to recover money lost in buying and selling a certain stock. A judgment in favor of the broker's assignee and against the customer was sustained. The following was said: " 'An additional finding that the contracts of the parties contemplated actual deliveries of shares of stock, and

that there was no violation of the provisions of section 26 of article IV of the state Constitution, lifts out of the case any contention that the contracts or transactions involved were illegal.' "

In *Mitchell* v. *J. H. Roth & Co.,* 124 Cal. App. 96 [12 Pac. (2d) 91], the court stated the facts and the law applicable thereto as follows: "The portion of section 26, article IV of the Constitution relied upon by appellant reads: 'All contracts for the purchase or sale of shares of the capital stock of any corporation or association without any intention on the part of one party to deliver and of the other party to receive the shares, and contemplating merely the payment of differences between the contract and market prices on divers days shall be void, and neither party to any such contract shall be entitled to recover any damages for failure to perform the same, or any money paid thereon, in any court of this state.' In the case before us both plaintiff and her assignor signed contracts in writing in which they agreed to buy the stock, each containing the following language: 'It is understood and agreed . . . that actual delivery is contemplated.' Thus on their face the contracts were not violative of the constitutional provision. It is appellants' contention, however, that the testimony shows that both plaintiff and her assignor had the oral undertaking with Lowery that they were not to receive the shares of stock or pay the balance due on them, but that Lowery agreed to sell the stock on April 1, 1929, for $35 per share and to pay them the difference between that sum and $25 per share, the price at which they had agreed to buy. Even thus nakedly stated, we are satisfied that the transaction is not in violation of the constitutional provision. The agreement was not the ordinary short-selling agreement in which the parties gamble upon the price of the stock at a fixed future date, the buyer to win if the stock goes up and the seller to win if the stock goes down. Here was no gamble at all. In consideration of their agreement to buy the stock and the payment of one-half of its purchase price Lowery promised absolutely that on April 1st he would sell the stock for a definite price, $35 per share. If he could not sell it for $35 on April 1st, he was not to sell it at all, nor did he make any effort to sell it at that date at a lower price. The plaintiff testified that she understood that if the stock did not sell for $35 on April

1st, 'then I was to get my certificates'; and plaintiff's assignor, Mrs. Riley, testified that she thought she owned the stock. We are satisfied that the constitutional provision in question is designed merely to prohibit dealing in futures with no intention to purchase or sell actual shares of stock, but merely to 'pay off' upon the rise or fall of the market between fixed days. (*Willcox* v. *Edwards,* 162 Cal. 455, 460 [123 Pac. 276, Ann. Cas. 1913C, 1392].) This was not such a transaction."

It is well settled that a broker in executing an order for a customer acts as the latter's agent in the transaction. (*Liberman* v. *McDonnell,* 97 Cal. App. 171 [275 Pac. 486]; *Gallagher* v. *Jones,* 129 U. S. 193 [9 Sup. Ct. 335, 32 L. Ed. 658]. In *Blankenhorn-Hunter-Dulin Co.* v. *Thayer,* 199 Cal. 90 [247 Pac. 1088, 1089, 48 A. L. R. 797], it is said: "As between a broker and a marginal customer the latter is also the owner of the stock and the broker is a pledgee (*Richardson* v. *Shaw,* 209 U. S. 365 [28 Sup. Ct. 512, 14 Ann. Cas. 981, 52 L. Ed. 835]; see, also, Rose's U. S. Notes; *Thomas* v. *Taggart,* 209 U. S. 385 [28 Sup. Ct. 519, 52 L. Ed. 845]), and has a lien on the stock for any advances he may make thereon and has the implied consent of the owner lawfully to repledge the same (*In re Wilson & Co.* [252 Fed. 631] *supra*); that as between the broker and his cash customer the latter is entitled to the immediate delivery of the stock (*Duel* v. *Hollins,* 241 U. S. 523 [36 Sup. Ct. 615, 60 L. Ed. 1143]), and the marginal customer is entitled to the delivery when he pays the balance of the contract price (*In re Mason,* 282 Fed. 202)."

The Supreme Court of the United States had occasion to consider the reciprocal obligations of a broker and customer under a marginal contract in *Richardson* v. *Shaw, supra,* and the following was quoted with approval from *Markham* v. *Jaudon,* 41 N. Y. 235, in that opinion: " 'The broker undertakes and agrees—1. At once to buy for the customer the stocks indicated. 2. To advance all the money required for the purchase beyond the 10 per cent furnished by the customer. 3. To carry or hold such stocks for the benefit of the customer so long as the margin of 10 per cent is kept good, or until notice is given by either party that the transaction must be closed. An appreciation in the value of the stocks is the gain of the customer, and not of the broker. 4. At

all times to have, in his name and under his control, ready for delivery, the shares purchased, or an equal amount of other shares of the same stock. 5. To deliver such shares to the customer when required by him, upon the receipt of the advances and commissions accruing to the broker: or, 6. To sell such shares, upon the order of the customer, upon payment of the like sums to him, and account to the customer for the proceeds of such sale. Under this contract the customer undertakes—1. To pay a margin of 10 per cent on the current market value of the shares. 2. To keep good such margin according to the fluctuations of the market. 3. To take the shares so purchased on his order whenever required by the broker, and to pay the difference between the percentage advanced by him and the amount paid therefor by the broker. The position of the broker is twofold. Upon the order of the customer he purchases the shares of stocks desired by him. This is a clear act of agency. To complete the purchase he advances from his own funds, for the benefit of the customer, 90 per cent of the purchase money. Quite as clearly he does not, in this, act as an agent, but assumes a new position. . . . In my judgment the contract between the parties to this action was, in spirit and effect, if not technically and in form, a contract of pledge.' '' In this same case, the Supreme Court of the United States quoted from Jones on Pledges, section 496, as follows: '' 'The broker acts in a threefold relation: First, in purchasing the stock he is an agent; then, in advancing money for the purchase, he becomes a creditor; and finally, in holding the stock to secure the advances made, he becomes a pledgee of it. It does not matter that the actual possession of the stock was never in the customer. The form of a delivery of the stock to the customer, and a redelivery by him to the broker, would have constituted a strict, formal pledge. But this delivery and redelivery would leave the parties in precisely the same situation they are in when, waiving this formality, the broker retains the certificates as security for the advances.' ''

From the foregoing authorities it would seem clear that the present Constitution does not prohibit marginal trading on a stock exchange where it is done in good faith, and where the broker actually buys the stock and has it or a like number of shares of the same stock for delivery to his

customer when the full purchase price, charges and interest are paid.

Payne testified that he at no time intended to accept any delivery of stock from his brokers, but was merely gambling on the stock market. He did not disclose this intention to his brokers during the entire time he was trading through them and until long after the break in the stock market made loss to him inevitable. A secret intent to violate the law, concealed in the mind of one party to an otherwise. legal contract, cannot enable such party to avoid the contract and escape his liability under its terms.

In considering appellant's second contention, that the three purchases of September, 1929, were unauthorized by Payne, and that he should not be required to pay for them, we must bear in mind that he was notified of the first two purchases by telegram and a memorandum by mail on the day they were made, and of the second purchase by mail, and that he also received by mail shortly after October 1, and November 1, 1929, itemized statements of his account showing these purchases, and that he did not object to their having been made until November 14, 1929, after their greatly reduced market values had made a loss from the purchases certain. We think these facts show a ratification of the purchases under the rule laid down by the United States Circuit Court of Appeals in the case of *Leviten* v. *Bickley, Mandeville & Wimple,* 35 Fed. (2d) 825, where the facts involved are very similar to those of the instant case.

Appellant relies upon *Pacific Vinegar etc. Works* v. *Smith,* 152 Cal. 507 [93 Pac. 85, 87], as authority supporting her second contention. Owing to the wide difference in the facts of the two cases we cannot so construe it. The following is a quotation from that authority: "If an agent with ostensible authority to sell his principal's wheat, but under instructions to sell it for not less than a dollar a bushel, shall sell and deliver it for fifty cents a bushel, there is no power in the principal to rescind the sale. Shall the principal by accepting the fifty cents be held to have exonerated his agent from liability for the other fifty cents per bushel? Such a doctrine certainly does not commend itself and is not sustained. It is limited, so far as the agent is concerned, to those cases where there remains with the principal, after his complete knowledge of the transaction, the power to rescind,

and failing so to do he is properly charged with full acceptance of all the responsibilities of the contract, even to the exoneration of his agent, because with the ability to rescind, if he had rescinded, the transaction would be at an end and nobody would be injured.'' The latter part of the quotation is applicable here. If Payne had disaffirmed the purchases promptly upon being notified of them the stocks could have been sold. He waited until such sales must result in serious loss to someone. He should not be permitted to take advantage of his own delay and thereby cause a serious loss to his agent.

Judgment affirmed.

Barnard, P. J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 15, 1933.