[S. F. No. 3624. In Bank.—July 22, 1904.]

E. B. EDSON et al., Board of Railroad Commissioners of the State of California, Appellants, v. SOUTHERN PACIFIC RAILROAD COMPANY, and SOUTHERN PACIFIC COMPANY, Respondents.

RAILROADS—LOWERING OF RATES—LIMITED TICKETS—CONSTRUCTION OF CONSTITUTION.—A railroad company "lowers its rates for the transportation of passengers," within the meaning of those words as used in section 20 of article XII of the constitution, by establishing limited tickets at reduced rates between two competing points, where it appears without conflict that ninety-five per cent of the traffic between those points was upon such limited tickets, notwithstanding they were conditioned against the right of stop-over and limited the recovery for loss of baggage if the privileges withdrawn were not the pecuniary equivalent of the reduction in price, and notwithstanding unlimited tickets were kept on sale at the former price, which was never changed for such tickets. [McFarland, J., and Henshaw, J., dissenting.]

ID.—POWER OF COURT TO SCRUTINIZE LIMITED TICKETS.—Although limited tickets are not in form a lowering of rate, but appear on their face to be merely the fixing of a lower rate for an inferior service, yet, for the purpose of giving effect to the constitutional provision, the court must scrutinize and regard the substance of the transaction, and for the purpose of determining whether there was a substantial reduction of the rate of passage between two points by means of such tickets, must look beyond the terms of the limited tickets to the conditions affecting the traffic for which rival companies were competing. [McFarland, J., and Henshaw, J., dissenting.]

ID.—FINDINGS—INCORRECT CONCLUSION.—Findings that the rate was not lowered must be disregarded as setting forth an incorrect conclusion where they rest on the assumption that the privileges demandable by the holder of an unlimited ticket stand for service rendered, which is true only in comparatively infrequent cases, in which such service is required, the reduced rate being practically a substitute for the greater rate in the great majority of cases. [McFarland, J., and Henshaw, J., dissenting.]

ID.— CONSTRUCTION OF CONSTITUTION — "EXCURSION OR COMMUTATION TICKETS."—The provision in section 21 of article XII of the constitution in reference to excursion or commutation tickets is not intended to modify section 20 of that article in any respect; but is simply a qualification of the preceding clause of section 21. The two sections embrace distinct subjects.

ID.—"PURPOSE OF COMPETING WITH ANY OTHER COMMON CARRIER"— RATES LOWERED IN SELF-DEFENSE — OBJECT OF CONSTITUTION.—

Rates, though lowered by a railroad corporation, are not lowered "for the purpose of competing with any other common carrier," within the meaning of the qualifying phrase of section 20 of article XII of the constitution, when they are merely lowered in self-defense to meet a lower destructive rate first inaugurated by a rival railroad company. In such case it is only the rival company which has "lowered its rate for the purpose of competition" within the meaning of the constitution. The whole object of the constitution was to foster legitimate competition by preventing destructive competition.

ID.—FEDERAL CONSTITUTION NOT INVOLVED.—Where the state constitution, as properly construed, has not been violated, the question as to whether its provisions are in conflict with the federal constitution is not involved, and will not be decided.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco and from an order denying a new trial. Frank H. Kerrigan, Judge.

The facts are stated in the opinion of the court.

U. S. Webb, Attorney-General, George A. Sturtevant, Deputy Attorney-General, and Frank H. Short, for Appellants.

The end attained and not the form of the transaction must be considered by the court in determining its substance and legal effect under the constitution. (*Cashman* v. *Root*, 89 Cal. 373;[1] *Sheehy* v. *Shinn*, 103 Cal. 328.) The debates on the constitution showing the object of the provision making competing rates effective and unchangeable without the consent of the railroad commissioners should be considered. (*People* v. *Stephens*, 62 Cal. 236.) It is the duty of the court to prevent the evasion of the constitution. (*Sheehy* v. *Shinn*, 103 Cal. 325; *Kullman* v. *Simmens*, 104 Cal. 595.) Section 20 of article XII of the constitution does not violate the federal constitution. (*Reagan* v. *Trust Co.*, 154 U. S. 394; *Spring Valley Water Works* v. *Schottler,* 110 U. S. 347.)

J. E. Foulds, John Garber, and P. F. Dunne, for Respondents.

The intent of the constitution is to be found only in the very words of the text. (6 Am. & Eng. Ency. of Law, 2d ed., p. 922; Cooley on Constitutional Law, 2d ed., pp. 54-56; *Greencastle* v. *Black*, 5 Ind. 570; *Chesapeake etc. Co.* v. *Man-*

[1] 23 Am. St. Rep. 482.

*ning,* 186 U. S. 248; Endlich on Interpretation, sec. 144.) An unlimited ticket confers a substantial right, protected by penal provision. (Civ. Code, sec. 490; *Robinson* v. *Southern Pacific Co.,* 105 Cal. 526.) A limited ticket is a waiver of substantial rights. (Elliott on Railroads, secs. 1595-1599.) Section 20 (art. XII) of the state constitution violates the fourteenth amendment of the federal constitution as being an arbitrary classification of railroad corporations, and denying them the equal protection of the laws. (*Johnson* v. *Goodyear Mining Co.,* 127 Cal. 4;[1] *Gulf etc. Ry. Co.* v. *Ellis,* 165 U. S. 150; *Union Sewer Pipe Co.* v. *Connelly,* 99 Fed. 354.)

BEATTY, C. J.—The defendants in this action are railway corporations and are respectively the owner and lessee and operator of a line of railway extending from San Francisco to Fresno, in this state. It is alleged that having lowered their rate for the transportation of passengers between said points for the purpose of competing with another railroad corporation, also engaged in transporting passengers between the same points, they afterwards raised said rate without the consent of the plaintiffs, in violation of that provision of section 20 of article XII of the state constitution, which reads as follows:—

"And whenever a railroad corporation shall, for the purpose of competing with any other common carrier, lower its rates for transportation of passengers or freight from one point to another, such reduced rates shall not be again raised or increased from such standard without the consent of the governmental authority in which shall be vested the power to regulate fares and freights."

The object of the action is to compel the defendants to restore the lower rate, by enjoining them from collecting any higher rate. The defendants deny that they have ever lowered their rates for the transportation of passengers within the meaning of said provision of the constitution, and contend that even if their acts could be held to have transgressed its terms or intent, this action must nevertheless fail for the reason that the provision quoted is violative of the rights secured to them, and all other persons, by the fourteenth amendment to the constitution of the United States.

[1] 78 Am. St. Rep. 17.

Both of these defenses were sustained by the superior court. From the facts found by him the judge concluded that there had been no lowering of rates within the meaning of the provision in question, and he also held that the provision itself was void by reason of its conflict with the fourteenth amendment to the federal constitution. Judgment was accordingly entered in favor of the defendants, and the cause is now here on appeal from that judgment and from an order denying the motion of plaintiffs for a new trial.

From the manner in which the case has been presented in the briefs and in the oral argument of counsel, we conclude that no importance is attached to the appeal from the order, since the discussion is based entirely upon the facts as admitted by the pleadings or found by the court, among which, however, are not included such general conclusions of fact as may be found inconsistent with the more specific findings. This being so, the findings themselves will clearly present the case to be decided. They are as follows:—

"1.

"For some time prior to July 18th, 1898, the San Francisco and San Joaquin Valley Railroad Company owned and operated a line of railroad between Fresno and Stockton, this state. By arrangement with an independent line of steamers running from Stockton to San Francisco, said railroad company established a through first-class unlimited passenger rate between Fresno and San Francisco of $3.75, which was in effect upon said date (and continued until December 9th, 1898, when said rate was withdrawn).

"2.

"On July 18th, 1898, and for many years prior thereto, defendant Southern Pacific Railroad Company owned, and defendant Southern Pacific Company, as its lessee, operated, a line of railroad from Stockton to Fresno, and another all-rail line from San Francisco to Fresno.

"3.

"Prior to said date defendant Southern Pacific Company charged, as a first-class unlimited passenger rate, with all the incidents prescribed by law, on its all-rail line between San Francisco and Fresno, $5.90, which rate was regularly established by the board of railroad commissioners of this state, and has not been modified by said board.

"On said date defendant issued its circular 86 referred to in the complaint, but said circular did not purport to modify or reduce the rate last aforementioned, or any rate on the first-mentioned line of railroad of said defendant between Stockton and Fresno, but purported to and did offer to the public over said last-mentioned all-rail line between San Francisco and Fresno, a rate of $3.75 for first-class passenger travel, subject to the following limitations and conditions, viz.: that the tickets issued thereunder should be good only on the day of sale, or upon such date as the agent selling the same should punch in the margin or stamp on the back thereof, that continuous passage must be made and no stop-over privileges be allowed thereon; that liability for baggage should be limited to the sum of one hundred dollars, and no baggage should be checked thereon to any point short of the ultimate destination named therein.

"4.

"That all of the tickets issued between San Francisco and Fresno by said defendant at the rate of $3.75 contained said limitations and conditions plainly printed upon their face, and said defendant at all times strictly insisted upon the observance of said limitations and conditions, and all passengers purchasing and using said tickets accepted and used the same subject thereto.

"5.

"That on the 20th day of March, 1900, said defendant withdrew and discontinued said rate of $3.75 and the issue of the special limited tickets aforesaid.

"6.

"That during the whole of said period between the 18th day of July, 1898, and the 20th day of March, 1900, the first-class unlimited passenger rate of $5.90 first hereinbefore mentioned was in force and effect, and was not withdrawn by said defendant, but unlimited first-class passenger tickets, at said rate, with all their legal incidents, were at all times kept for sale by said defendant, and were, in fact, during the whole of said period sold by it to such persons as desired to purchase the same.

"7.

"That the limitations and conditions contained as aforesaid in said tickets sold at the $3.75 rate constitute substantial

differences from the service rendered, and materially diminish the accommodations and privileges to which a passenger would be entitled, under the $5.90 rate.

"8.

"That the $3.75 rate, with its inferior accommodations and privileges, was put into effect for the purpose of competition with the San Francisco and San Joaquin Valley Railroad Company, but by reason of the difference in service, and the fact that the $5.90 rate was at all times kept in force and tickets sold and kept for sale thereunder, said $3.75 rate was not a reduction of or substitute for the $5.90 rate.

"9.

"That at no time during the whole of said period from July 18, 1898, to March 20, 1900, did the defendant lower its rates of transportation of passengers, nor has it since said period raised or increased said rates.

"10.

"That during all said period from July 18, 1898, to March 20, 1900, the unlimited passenger tickets mentioned in finding No. 6 were at all times in good faith kept for sale and sold by defendants and used by purchasers thereof in accordance with and with the full benefit of the privileges conferred thereby."

Nos. 7 and 9 of these findings and the latter part of No. 8 are not treated by plaintiffs as findings of fact, but as mere conclusions drawn from the specific facts found, which, according to the argument of counsel, involve an opposite conclusion.

This contention raises the first question to be considered, for if we should agree with the judge of the superior court that there has been no infraction of the state constitution there would be no occasion to inquire whether there was a conflict between it and the federal constitution, for courts do not go out of their way to decide constitutional questions even when nothing more is involved than the validity of a clause of an act of the legislature, and still less will they go to the extent of declaring void an important provision of our fundamental law in a case which demands no consideration of the question.

What, then, is a lowering of rates within the meaning of the constitution?

To answer this question is must first be determined what are the rates to which the constitution refers.

We think it clear that it refers to and comprehends all established rates for ascertained services, whether those prescribed by the railroad commissioners or fixed by the corporation themselves within the *maximum* so prescribed. We do not understand that the railroad commissioners do more than to prescribe the *maximum* charge allowable. Within that *maximum* a corporation may establish its own rates, but whether it charges the *maximum* or less, it must have some established rate of fare, upon tender of which a passenger may demand a ticket entitling the holder at any time within six months to ride from the place of purchase to the depot of destination or to any intermediate station with the right to stop over, and afterwards, within the six months, resume his journey. (Civ. Code, sec. 490; *Robinson* v. *Southern Pacific Co.*, 105 Cal. 526.) Subject, however, to this strict obligation to provide and furnish what may be called an unlimited ticket—a ticket which secures to the passenger the stop-over, and other statutory privileges—it is conceded that a railroad corporation may issue a limited ticket if the passenger in consideration of some abatement of the regular rate is willing to contract for a curtailment of the statutory privileges. Such a rate, we suppose, if regularly established and offered to the public generally, would come within the meaning of the constitution. This, however, is a question which does not call for a decision in the present case. The defendants are not charged with having first lowered and afterwards raised their rates on limited tickets; their offense, if any, consists solely in the fact that for the purpose of competing with another railroad they sold to all persons desiring them limited tickets for $3.75 when the regular fare for unlimited tickets was $5.90, and that afterwards they withdrew the limited tickets, with the necessary effect of compelling all passengers to pay the higher rate.

In *form* it must be conceded this was not a lowering of the established rate. It was merely the fixing of a different rate for a different service—a lower rate for an inferior service. But for the purpose of giving effect to a statute, and *a fortiori* for the purpose of enforcing a provision of the constitution, it is the substance, not the mere form, of a transaction

that must be regarded, and to determine whether there was in this instance a substantial reduction of the rate of passage between San Francisco and Fresno we must look beyond the terms of the limited tickets to the conditions affecting the traffic for which the rival companies were competing. The statutes of the state secure to the purchaser of an unlimited ticket the right to travel over the designated route at any time within six months. To a passenger who happens to be delayed in starting, this is a privilege of substantial value. An unlimited ticket is good during the six months in the hands of any holder, and to a purchaser who desires, or is compelled, to abandon his journey the privilege of transferring his ticket is of substantial value. A passenger bound to a distant station sometimes desires to stop over at an intermediate station, and if the through fare is less per mile than the local fares the privilege of stopping over and afterwards resuming his journey is of substantial value to him. A passenger carrying baggage of considerable value might prefer to pay the full price of an unlimited ticket rather than enter into a contract limiting his recovery in case of loss to one hundred dollars. In a legal sense, therefore, it cannot be denied that each of the privileges secured to the purchaser of an unlimited ticket, and relinquished by the purchaser of a limited ticket, was a substantial and valuable one. But we suppose a court may take judicial notice of facts of common knowledge, and, among others, of the fact that but a small percentage of those traveling between places of the relative situation of San Francisco and Fresno have any occasion to avail themselves of all or of any of the privileges which purchasers of limited tickets were compelled to stipulate away. The evidence in this case shows without contradiction that during the time both classes of tickets were kept on sale fully ninety-five per cent of the travel between San Francisco and Fresno was upon limited tickets at the $3.75 rate. This may not sustain the conclusion that to nineteen passengers out of twenty the privileges secured by the unlimited ticket were of no pecuniary value, but does clearly prove that they were to that number worth less than the difference between the two rates, and to many no doubt worth nothing at all. Assuming this to be so, it destroys the force of the proposition upon which respondents base their argument. They say that

"the only possible way to lower a rate is to charge less for the same service." This may be conceded, but if it happens that the extra service demandable by the holder of an unlimited ticket is one which he seldom needs and rarely exacts, the limited ticket in fact secures to the principal portion of the traveling public the same service secured by the unlimited ticket, and the rate fixed for the limited ticket is practically, for all purposes of competition, the only rate for the services ordinarily rendered. In view, therefore, of the conditions actually prevailing, the defendants did make a lower rate for the same service, as to a portion, and it would appear, a very large portion—of the traveling public—a portion certainly important for purposes of competition—which is the controlling consideration in construing and applying this provision of the constitution. So far as that portion of the public which makes no use of the privileges attaching to the unlimited ticket is concerned, a lowering of the rate, coupled with the restriction of the privileges, is an absolute lowering of the rate, and even as to others it is a lowering of the rate unless the privileges withdrawn are the pecuniary equivalent of the reduction in the price.

The fact that the old regular ticket was kept on sale at the old rate of $5.90 does not invalidate this conclusion. If I have been offering to perform a certain service for ten dollars, and afterwards offer to perform a nominally different but substantially identical service for five dollars, I cannot deny that I have lowered my rate merely because I have proclaimed my willingness to accept the old rate from those who are willing to pay it. If two rates are offered for what to nineteen men out of twenty is the same service, the lower rate as to the nineteen is the only rate.

Now, the meaning of the constitutional -provision is sufficiently clear if its terms alone are considered. It was intended to secure legitimate competition by preventing railroad corporations from reducing fares below remunerative rates for the purpose of crushing weaker rivals, and thus securing a monopoly. To accomplish this object they are warned that if for the purpose of competition they establish a confiscatory rate they cannot raise it again without the consent of the state. This construction seems to assert itself in the very language of the provision and is fully confirmed

by the debates in the constitutional convention. If this view is correct it can hardly be denied that a rate has been lowered within the meaning of the constitution merely because it has been retained as to a fraction of the traveling public. For, obviously, if the rates and conditions are so arranged by the corporation that the privileges withdrawn are of very little value to any, and of no value to most passengers, the very thing can be accomplished which it was the evident intention of the constitution to prevent. The argument is, and of course must be, that the terms of the contract contained in the limited ticket are the subject of arrangement between the company and its patrons exclusively. It can give as large a reduction as it chooses for the relinquishment of all privileges beyond mere transportation, and it can give as large a reduction for the surrender of a single least valuable privilege as for all privileges, for in point of law the relinquishment of a single privilege is as good a consideration for a contract as the surrender of all privileges.

The only alternative to this proposition is, that the courts may scrutinize the terms of the limited ticket and may inquire into the conditions surrounding the traffic for the purpose of determining whether what purports to be a special contract for inferior services is not in reality a lowered rate for the same, or substantially the same, service. If this cannot be done one of two things must follow: either that the constitutional provision in question is a dead letter or else that all such contracts are forbidden. In the Robinson case it was assumed, and we think correctly assumed, that such contracts are lawful, but if the effect of holding such contracts lawful would make the law defeat the constitution we should feel constrained to modify the opinion then expressed, for a law, whether enacted by the legislature or evoked by construction of the courts, can never nullify the constitution. We do not, however, concede the existence of any conflict between the constitution and what was said in the Robinson case. Contracts for limited tickets are valid, but in a controversy of this complexion the courts will look behind the form of the transaction to determine whether such contract offered to the public generally amounts in fact to a lowering of rates. In so holding we do not question the legal principles for which the respondents contend. We concede that

the same principles and rules of construction are to be applied to the constitution as to a statute, that the power reserved to the state to interfere with the right of contract is not to be extended or enlarged by implication, and that the only case to which this provision of the constitution is to be applied is an actual lowering of rates. We do not, however, concede that the lowering of a rate for the purpose of competition, such as is found in this case, ceases to be such merely because it is coupled with restriction of privileges. Whether it does or not depends upon the value of the privilege as compared with the extent of the reduction in any case; and still more, it depends upon whether the privileges withdrawn are by any considerable number of passengers exercised or claimed; whether, in other words, the privileges so withdrawn represent any service actually rendered on one side or claimed on the other.

The only difficulty in applying this doctrine to the present case arises from the fact that according to the findings of the superior court (No. 9) the defendant did not lower its rate. If this finding is to stand as a finding of fact, it ends the case so far as the appeal from the judgment is concerned, and the plaintiffs would be compelled to fall back upon their appeal from the order denying a new trial, regarding which, as · above stated, nothing has been said in the argument. But we think finding No. 9 is merely a conclusion drawn from the specific facts found and inconsistent with those facts if, as we have above assumed, we are authorized to take judicial notice of the notorious fact (fully proved, but not found in this case) that comparatively few persons exercise or claim the privileges, or any of them, denied to purchasers of limited tickets. The great majority of persons traveling back and forth between San Francisco and points in the interior of the state purchase their tickets at the time of starting and have no desire to transfer them or to stop over at intermediate stations. If their baggage sometimes exceeds one hundred dollars in value the risk of loss is so slight that the premium on insurance against loss would be a trifle. To save two dollars and fifteen cents on a fare to or from Fresno by taking a limited ticket would be a clear gain of that amount—not perhaps to nineteen out of twenty passengers, but certainly to so large a number as to count heavily in the matter of com-

petition.   If this is so the conclusion set forth in findings Nos. 7, 8, and 9 cannot stand.   They depend necessarily, and are clearly made to depend, upon the assumption that the privileges demandable by the holder of an unlimited ticket stand for service rendered; but this is true only in the comparatively infrequent cases in which the service is required. In the great majority of cases the service is not rendered, and for all such cases the $3.75 rate was practically a substitute for the $5.90 rate.

Counsel for respondents have not on the present appeal renewed their former contention, that the limited tickets sold for $3.75 were the ''excursion or commutation'' tickets referred to in section 21 of article XII of the constitution, and it is perhaps unnecessary to make any reference to that provision.   It is sufficient to say, that in our opinion the last clause of section 21 was not intended to modify section 20 in any respect, but is simply a qualification of the preceding clause of the same section.   The two sections embrace distinct subjects.   The first deals with pooling and competition between independent transportation companies.   The second with discriminations between persons and places by the same company.   To prevent discrimination between places it is provided by section 21 that no greater charge shall be made for transportation over a shorter distance than is made for a longer distance, including the shorter.   As a qualification to this provision, and for no other purpose, the proviso as to excursion and commutation tickets is added, leaving the provision of section 20 as to competition between rival lines entirely unaffected.

For the reasons and upon the grounds stated, we hold that the defendant the Southern Pacific Company did lower its rate from $5.90 to $3.75, within the meaning of the constitution.

But was the rate lowered for *''the purpose of competing with any other common carrier''* within the meaning and intent of that qualifying clause?   In the ordinary sense of the word, no doubt the rate was lowered for the purpose of competition, and the superior court has found as a fact that what we have held to have been, in substance though not in form, a lowering of rates was for the purpose of competition.   But if we consider the evident intent of the provision in question,

CXLIV. Cal.—13

and more especially if we consider the circumstances and history of its adoption, it is clear that the act of the defendants was not such as the framers of the constitution, or the people who adopted it, had in view, or intended to punish. The whole object of the provision was to foster legitimate competition by preventing destructive competition. Its framers evidently anticipated that a more powerful corporation for the purpose of securing a monopoly of traffic might sometimes be tempted to lower its rates to a point where they would cease to be remunerative, and keep them there until its weaker competitors were driven from the field, after which it would raise its rates above the point at which they could be sustained in the presence of legitimate competition. It was no part of their design to punish a corporation for merely lowering its rates in self-defense to meet a lower rate inaugurated by a rival carrier, and that is all that the Southern Pacific Company is found to have done in this instance. It is the corporation which lowers its rates for the purpose of destroying a rival, not the one which for the mere purpose of self-preservation meets the rate which the act of the other constrains it to adopt, that is the proper subject of the penalty imposed by the constitution, and this case is itself an illustration of the injustice and evil which might result from adhering to the literal terms of the constitution in disregard of the broad policy it was designed to promote. Or take this illustration: There is an operating line of railway between two points with established rates of fare. A parallel and competing line is constructed and at the start its rates are made so much lower as to be unremunerative. If it is backed by sufficient capital it may by this means drive the rival company out of the field, and after securing the monopoly may, without incurring any penalty, immediately raise its rates to the *maximum* allowed by the railroad commission. But if the attempt to destroy the old line has failed—if by lowering its rate to meet the rate established by its rival the old line has secured enough of the traffic to preserve its existence, it cannot without the consent of the railroad commission restore a remunerative rate .although the real transgressor of the policy of the constitution may. We do not think the constitution should be given a construction which would allow it to operate so unjustly and so contrary to its spirit and in-

tention.   Properly construed and limited in its operation, it subserves a policy which the people of the state approve, but by adhering too strictly to its literal terms it may be reduced to a dead letter by regarding merely the form of the limited ticket, while shutting our eyes to the conditions of railroad traffic, or, on the other hand, it may be made to defeat the very policy it was designed to promote.   The same principle of construction should be applied to the phrase ''for the purpose of competing'' that is applied to lowering of rates.   Each should be construed with reference and in subordination to the main purpose and policy of the constitution.   A substantial lowering of the rates should not be allowed to pass unchallenged under the disguise of limited tickets, and, on the other hand, a corporation which merely meets a lower rate previously established by a competing carrier should not be held to have lowered its rates for the purpose of competition within the true meaning of that expression.

We think the judgment and order of the superior court should be affirmed, not because the rate was not lowered, but because it was not lowered for the purpose of competition within the proper construction of the constitution.

It is so ordered.

Angellotti, J., Shaw, J., and Van Dyke, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment of affirmance upon the ground last stated in the opinion of the chief justice.   I dissent, however, from that part of the opinion which holds that the facts in this case constitute, under any view, a lowering of a rate within the meaning of the constitution.   And, in my opinion, a still stronger and clearer ground for affirming the judgment is in the finding of the lower court ''that at no time during the whole of said period from July 18, 1898, to March 20, 1900, did the defendant lower its rates for transportation of passengers, nor has it since said period raised or increased said rates.''

The provisions of the constitution in question are not only new and unusual, but severely restrictive of ordinary personal rights, and highly penal in their character.   The corporation coming within their penalty is deprived of the beneficial use and enjoyment of its property, and, if the sec-

tion is in all respects valid, cannot invoke the aid of the courts against the enforcement of an unreasonable and unjust rate of fares or freights, because it has forfeited the right to do so. It has the mere privilege of asking a favor of the commissioners, and it is clear that such a provision of law, whether found in a statute or a constitution, will not be carried by implication or strained construction to any act not coming clearly and beyond doubt within the language of the provision; the language used, given its full meaning, must itself include the case in hand. This principle is well stated by the supreme court of the United States in *Chesapeake etc. Co.* v. *Manning,* 186 U. S. 248, a case quite similar to the case at bar, as follows: "While a legislature may prescribe regulations for the management of business of a public nature, even though carried on by private corporations with private capital and for private benefit, the language of such regulations *will not be broadened by implication.* In other words, there is no presumption of an intent to interfere with the management by a private corporation of its property any further than the public interests require, and so no interference will be adjudged *beyond the clear letter of the statute.*" Indeed, this principle is so well established as to be a part of received text-book learning. In Endlich on Interpretations of Statutes, in section 340, it is said that "statutes which encroach on the rights of the subject, whether as regards persons or property, are similarly subject to a strict construction. It is presumed that the legislature does not desire to confiscate the property, or to encroach upon the rights of persons; and it is therefore expected that if such be its intention, it will manifest it plainly, if not in express words, at least by clear implication, and *beyond reasonable doubt.*" And in section 331 the same author shows that the rule of strict construction of laws which are in their nature penal is not confined to cases where the enforcement of the penalty is by criminal prosecution. *Interstate Commerce Comm.* v. *Cincinnati etc. Ry. Co.,* 167 U. S. 494, is another case in which it is held that new and unusual provisions in a law are not to be extended by implication. And these principles of construction are as applicable to the provisions of a constitution as to those of a statute, although some authorities hold that there should be a stricter construction of the former

than of the latter; however, in either case the intent is to be found in the language used. (See cases cited in notes on pages 921 and 922, vol. 6, Am. & Eng. Ency. of Law.)

Applying these principles to the case at bar, it seems quite clear that the acts done by respondents do not bring them within the prohibitory language of section 20. That language includes only the lowering and subsequent increasing of a rate. Of course, the lowering of a rate presupposes a previous existing rate which may be lowered; and a rate is clearly a sum fixed to be charged for a certain service. It is quite common for railroad companies to have different kinds of tickets offering different kinds of services for which different rates are charged, and to lower the rate in one of such tickets would be simply to lessen the charge for the same, while leaving the service to which it entitled the passenger unchanged. In the case at bar the respondents had an established rate of $5.90 for a ticket which entitled the purchaser to all the usual rights and accommodations of an unlimited first-class ticket—including the stop-over privilege, the right to use it at any time within six months, transferability, etc. Now, they did not directly, or expressly, or as a matter of fact, lower the rate on that ticket. They did not withdraw it, nor deny those desiring to purchase it any of the rights or services which it undertook to give; on the other hand, it was kept on sale, and was sold, and those purchasing it got all it purported to give. How, therefore, can it be said that they lowered the rate on such ticket? What they did was to also sell another ticket at the rate of $3.75 by which they contracted for different and inferior services; they did not lower the rate for the services guaranteed by the $5.90 ticket. The two different tickets, with two different rates, stood together. They, therefore, did not do anything which section 20 prohibits, under any possible construction which could reasonably be given to it.

Really, the contention of appellants rests upon the proposition that section 20 prohibited respondent from selling any other kind of ticket than the $5.90 ticket, for any other kind of service. But there is no such prohibition. Such prohibition could not be judicially put into the constitution by any kind of reasonable construction—even without reference to the principle of interpretation which, as hereinbefore stated,

must be applied to provisions which restrain ordinary personal rights, and are penal in their character. Indeed, the case for appellants rests upon the unwarranted conjecture, founded upon something not apparent from the language used, that the makers of the constitution *intended* to prohibit a railroad company from issuing a limited ticket providing for a diminished service at a lower rate. But, in the first place, there is no warrant for such a conjecture; and, in the second place, if such intent on the part of the makers of the constitution to prohibit such tickets could be reasonably imagined, the fact remains that they *did not do it*. And so, as to this point, appellants must rely upon a far-fetched and strained implication entirely discountenanced by the rules of construction which apply to provisions like those here involved.

There is still a further contention that there is no substantial difference between the services given under the $5.90 ticket and those allowed under the $3.75 ticket, and that therefore the asserted difference is merely colorable. If that be so, then upon the payment of the $5.90 fare the passenger would not be entitled to the stop-over right, or the six months time, etc., but the railroad company could compel him to accept the ticket which represented the $3.75 fare, because, as asserted, there is "no substantial difference" between the two services. Certainly no one would contend for this proposition. The fact is that those rights which accrue under the $5.90 ticket, and could not be asserted under the $3.75 ticket, are substantial and material, and have been the foundation of a large amount of litigation. (See chap. LXVII of Elliott on Railroads, vol. 4, p. 2482, on "Tickets, Fares, and Passes," and the numerous cases there cited.) Indeed, the decision of this court in the important case of *Robinson* v. *Southern Pacific Co.*, 105 Cal. 526, rested entirely upon the important and substantial value of the stop-over privilege—where it was held that the ticket issued by the defendant in that case, taken in connection with certain statutory provisions, entitle plaintiff to a stop-over privilege which was enforced by the judgment. But in that case the distinction between different kinds of tickets and fares was fully recognized. The court, in response to a petition for rehearing, said: "We do not hold, and it does not follow from the views herein ex-

pressed, or from anything decided or said by way of argument in our original opinion, that there can be no ticket sold on any line of road which is not a stop-over ticket. We only hold that there must be a regular passenger rate established from one depot to another, and that a passenger who tenders the regular fare is entitled to a ticket to his place of destination, which ticket, under the law, gives him a right to stop over at an intermediate station. And the railroad company cannot demand the regular fare and at the same time deny the privilege which the law confers upon all who pay such rate. If, in consideration of an abatement from the regular established rate, a passenger voluntarily accepts an excursion or other limited ticket, an entirely different case is presented."

It is argued that the acts of respondents constitute an evasion of section 20—the word "evasion" evidently being used in its worst sense. But, as stated in Endlich on Interpretations, "It is not evading an act to keep outside of it," and a provision of law "is always subject to evasion in that sense; for there is no obligation not to do what the legislature has not really prohibited." (Sec. 144.) And there is no significance attaching to the fact that there was evidence to the point that a large majority of the passengers bought the $3.75 ticket, while a comparatively small number bought the $5.90 ticket. Whether or not respondents subjected themselves to the drastic and ruinous penalty of section 20 depends upon what they did—not on what others did. So remote a consideration is entirely beyond the principles of construction which, as hereinbefore stated, apply to restrictive and penal provisions such as those here involved.

Under the foregoing views the second question—that is, whether or not the said section 20 is in conflict with the fourteenth amendment of the constitution of the United States— need not be determined or discussed.

Henshaw, J., concurred, with McFarland, J.

Rehearing denied.