[No. B112528. Second Dist., Div. Three. June 24, 1998.]

PROPOSITION 103 ENFORCEMENT PROJECT, Plaintiff and Appellant,
v.
CHARLES QUACKENBUSH, as Insurance Commissioner, etc., et al.,
Defendants and Respondents;
INSURANCE BROKERS AND AGENTS OF THE WEST, INC.,
Intervener and Respondent.

1474

**COUNSEL**

Edward P. Howard, Gus T. May and Laura N. Diamond for Plaintiff and Appellant.

Roy Ulrich as Amicus Curiae on behalf of Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, David S. Chaney and Diane Spencer Shaw, Deputy Attorneys General, William W. Palmer, Leslie E. Tick, Heller, Ehrman, White & McAuliffe, Paul Alexander, Vanessa Wells,

LeBoeuf, Lamb, Green & MacRae, Kenneth Schnoll and Kyle M. Fisher for Defendants and Respondents.

Barger & Wolen, Steven H. Weinstein, Richard G. De La Mora, Marina M. Maniatis as Amici Curiae on behalf of Defendants and Respondents.

Stephen L. Young, Keker & Van Nest, Susan J. Harriman and Steven A. Hirsch for Intervener and Respondent.

## OPINION

**CROSKEY, Acting P. J.**—Plaintiff, The Proposition 103 Enforcement Project (the Project) filed a petition for preliminary and permanent injunction and a complaint for declaratory relief (the complaint) against Charles Quackenbush, as the Commissioner of Insurance of the State of California (the Commissioner) and Michigan Millers Mutual Insurance Company, Zurich Insurance Company, Williamsburg National Insurance Company, and State Farm Group of Insurance Companies (collectively, the Insurers) for a declaration that Insurance Code section 769.2[1] is invalid and to enjoin the Commissioner from enforcing its provisions in current and future settlements with the Insurers as to a determination of the Insurers' liability to refund to policyholders the overpayments, if any, of premiums for the 1988-1989 year.[2] Such premium overpayments would exist to the extent that the Insurers either had (1) failed to reduce premium charges for coverage in 1988-1989 to a level no higher than 80 percent of the premium charged in 1987, as required by section 1861.01, subdivision (a), or (2) charged a premium higher than 80 percent of the 1987 premium without being able to show that such a higher premium was necessary in order to avoid a constitutionally unacceptable or confiscatory rate of return.[3]

According to the Project, the Commissioner has been settling the amount of rollbacks, and in doing so has applied section 769.2 , which was enacted by the Legislature after Proposition 103 was adopted by the voters. Application of section 769.2 has resulted in a significant reduction of the amount

---

[1]Unless otherwise noted, all statutory references are to the Insurance Code.

[2]Insurance Brokers and Agents of the West, Inc. (the Brokers and Agents) intervened in this action.

[3]The California Supreme Court, in *CalFarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805 [258 Cal.Rptr. 161, 771 P.2d 1247] (*CalFarm*), struck down as unconstitutional a provision in Proposition 103 which had only allowed insurers to seek relief from the required rollback to 80 percent of their 1987 premiums if they could show that otherwise they would become substantially insolvent. Under *CalFarm*, an insurer is constitutionally entitled to a reasonable rate of return on its investment. Proposition 103's requirement of an at least 20 percent rollback is constitutionally subject to that restriction.

of refunds payable to policyholders. The Project sought to intervene in those settlements for the purpose of arguing that section 769.2 was unconstitutional. Its request for leave to intervene was denied by the Department of Insurance. It therefore filed the instant complaint. Although one trial judge granted the Project's motion for a preliminary injunction, finding it was likely to succeed on the merits, another trial judge granted judgment in favor of the Commissioner, the Insurers, and the Brokers and Agents following the parties' cross-motions for summary judgment. The Project filed a timely notice of appeal, and sought a writ of supersedeas to stay the judgment pending finality of the proceedings on appeal. We denied that writ but now decide that the judgment must be reversed because section 769.2 is constitutionally invalid as an act in excess of the Legislature's powers.

## Factual and Procedural Background

On November 8, 1988, the voters of California approved the initiative measure known as Proposition 103, which added article 10, "Reduction and Control of Insurance Rates" to the Insurance Code. (§ 1861.01 et seq.) Proposition 103 provided, in relevant part:

"Section 1. Findings and Declaration.

"The People of California find and declare as follows:

"Enormous increases in the cost of insurance have made it both unaffordable and unavailable to millions of Californians. [¶] *The existing laws* inadequately protect consumers and *allow insurance companies to charge excessive, unjustified and arbitrary rates.* [¶] Therefore, the People of California declare that insurance reform is necessary. *First, property-casualty insurance rates shall be immediately rolled back to what they were on November 8, 1987, and reduced no less than an additional 20%.* Second, automobile insurance rates shall be determined primarily by a driver's safety record and mileage driven. *Third, insurance rates shall be maintained at fair levels by requiring insurers to justify all future increases.* Finally, the state Insurance Commissioner shall be elected. Insurance companies shall pay a fee to cover the costs of administering these new laws *so that this reform will cost taxpayers nothing.*

"Section 2. Purpose.

"The purpose of this chapter is to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure

that insurance is fair, available, and affordable for all Californians. . . . [¶] . . . .

"Section 8. Technical Matters.

"(a) *This act shall be liberally construed and applied in order to fully promote its underlying purposes.* [¶] (b) *The provisions of this act shall not be amended by the Legislature except to further its purposes* by a statute passed in each house by roll call vote entered in the journal, two-thirds of the membership concurring, or by a statute that becomes effective only when approved by the electorate. [¶] (c) If any provision of this act or the application thereof to any person or circumstances is held invalid, that invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are severable." (Prop. 103, §§ 1, 2, 8, 1 Stats. 1988, pp. A-276, A-290, italics added.)

Section 1861.01 which was added by Proposition 103, provides:

"(a) *For* any coverage for a policy for automobile and *any* other *form of insurance subject to this chapter issued or renewed on or after November 8, 1988, every insurer shall reduce its charges to levels which are at least 20% less than the charges for the same coverage which were in effect on November 8, 1987.* [¶] (b) Between November 8, 1988, and November 8, 1989, rates and premiums reduced pursuant to subdivision (a) may be only increased if the commissioner finds, after a hearing, that an insurer is substantially threatened with insolvency. [¶] (c) Commencing November 8, 1989, insurance rates subject to this chapter must be approved by the commissioner prior to their use. [¶] (d) For those who apply for an automobile insurance policy for the first time on or after November 8, 1988, the rate shall be 20% less than the rate which was in effect on November 8, 1987, for similarly situated risks. [¶] (e) Any separate affiliate of an insurer, established on or after November 8, 1987, shall be subject to the provisions of this section and shall reduce its charges to levels which are at least 20% less than the insurer's charges in effect on that date." (Italics added.)

In 1989, the California Supreme Court considered the constitutionality of Proposition 103. In *CalFarm, supra*, 48 Cal.3d 805, it held that each insurer must be given the opportunity to show that, as applied, the full minimum 20 percent rollback would be confiscatory. The Commissioner then adopted regulations that establish a consistent ratemaking methodology to determine the minimum nonconfiscatory rate. The regulations include a single ratemaking formula specifying how the hundreds of components of the insurer's rate

are to be used to calculate the refund, and the regulatory standards for expense efficiency and a fair profit. Those regulations were upheld in *20th Century Ins. Co.* v. *Garamendi* (1994) 8 Cal.4th 216 [32 Cal.Rptr.2d 807, 878 P.2d 566] (*20th Century*).

In 1991, the Legislature added section 769.2. (Stats. 1991, ch. 340, § 1, p. 1952, eff. Aug. 5, 1991.) In its original version, section 769.2 provided:

"Any insurer that makes a partial refund of premiums pursuant to Section 1861.01 of this code with respect to insurance issued prior to November 8, 1989, may not require an agent or broker to refund any portion of a commission which the insurer has claimed, and the commissioner has allowed, as an expense for purposes of the commissioner's determination of the insurer's actual return for the lines of insurance subject to Section 1861.01.

"*Nothing in this section or the application thereof shall alter the amount of any refund payable to policyholders pursuant to a decision of the commissioner in a rate-of-return hearing.*" (Italics added.)

In 1993, the Legislature repealed original section 769.2, and added new section 769.2. (Stats. 1993, ch. 1248, § 3, eff. Oct. 11, 1993.) New section 769.2 provides:

"(a) *In determining the amount of an insurer's rollback obligation pursuant to Section 1861.01 or any regulations promulgated to implement this section, each insurer shall be given full credit for all premium taxes, commissions, and brokerage expenses that the insurer actually paid during the rollback period.* No insurer shall be required or permitted to seek, directly or indirectly, reimbursement from the state of any premium taxes paid on premiums earned during the rollback period or reimbursement from any employee or third-party contractor of an insurer of any compensation paid to them for services rendered during the rollback period.

"(b) The provisions of this section and the findings and declarations in support thereof take effect immediately upon enactment and apply to any order, settlement agreement, consent decree, or any other resolution of an insurer's rollback obligation pursuant to Section 1861.01 that occurs after the effective date of this section.

"(c) Nothing in this section shall be deemed in any regulatory or judicial proceeding or for any other purpose to constitute legislative intent to endorse or approve any regulations on the issue of Proposition 103 rollback refunds." (Italics added.)

In repealing and then reenacting section 769.2, the Legislature made the following pronouncement of legislative intent:

"The Legislature finds and declares that it was not the intent of the people in enacting Proposition 103 to diminish state revenues or impact the General Fund. The Legislature further finds and declares that proper implementation of the rollback provisions of Section 1861.01 of the Insurance Code does not impose upon the State of California any obligation to refund tax revenues in the form of premium taxes paid during the rollback period.

"The Legislature further finds and declares that employees of, and third-party independent contractors to, any insurer subject to the rollback provision of Section 1861.01 of the Insurance Code or any regulations promulgated to implement this section, are not obligated to participate in those insurers' rollback obligations, nor are those employees or independent contractors obligated to refund any compensation previously paid to them for services rendered during the rollback period.

"The Legislature further finds and declares that Section 1861.01 of the Insurance Code does not require or permit any order, settlement agreement, consent decree, or other resolution of the insurer's rollback obligation, including any regulations promulgated by the commissioner, directly or indirectly, to require the State of California to contribute any amount to any rollback obligation, or be interpreted to permit or require the insurer to recover any amount from its employees or independent contractors in order to achieve a fair rate of return as provided by the California Supreme Court in *CalFarm* v. *Deukmejian*, 48 Cal.3d 805.

"*The Legislature finds and declares that this statute furthers the purpose of Proposition 103.* To effectuate the foregoing findings and declarations, the Legislature hereby repeals and reenacts Section 769.2 of the Insurance Code as provided in this act." (Stats. 1993, ch. 1248, § 1, italics added.)[4]

The Commissioner began to apply and has been applying section 769.2 as part of the calculation which results in the final determination of refunds of excess premiums paid by policyholders following the enactment of Proposition 103. The effect of applying section 769.2 is to reduce an Insurer's rollback obligation by the full amount of the premium taxes and commissions actually paid by the Insurer on the excess premiums it collected—in

[4]The 1993 version of section 769.2 was adopted by roll call vote, and, as required by Proposition 103 for effective amendment of its provisions, was passed by at least a two-thirds vote in both the Senate and the Assembly.

other words, such taxes and commissions are treated as fully deductible expenses from the premium income. Before original section 769.2 was added in 1991, an Insurer presumably was entitled, if its premiums were ultimately determined to be excessive, and depending on its contractual relationship with its agents and brokers, to seek a refund of commissions paid as a percentage of any excess amount of premium. (§ 769.2, as enacted in 1991.) So, too, until the Legislature repealed original section 769.2 and reenacted section 769.2 in 1993, an insurer apparently was entitled, if its premiums were determined to be excessive, to seek a refund of premium taxes paid on the excess portion of the premium. (§ 12977 et seq.) In other words, before the reenactment of section 769.2 in 1993, everyone—the insurers, the Brokers and Agents, and the State of California—had to give up their share of excess premiums paid by policy holders, thus leaving the full amount of such excess premiums available for refund to policy holders. As the former version of section 769.2 specifically provided, "[n]*othing in this section or the application thereof shall alter the amount of any refund payable to policyholders pursuant to a decision of the commissioner in a rate-of-return hearing.*" (Italics added.)[5] In contrast, the current version of section 769.2 is strikingly silent as to its effect on the amount of refunds to policy holders, hardly surprising given that it makes sure that neither the State of California nor the Brokers and Agents must return their share of such excess proceeds, and that the Insurers may fully deduct such amounts as expenses before the Commissioner calculates the amount of refund due policy holders.[6] Not surprisingly, the evidence presented by the Project below showed that, in fact, application of current section 769.2 resulted in a reduction of the Insurers' rollback obligations and in a reduction in the amount of refunds to

---

[5]This provision, included in the original 1991 version of section 769.2, was not reenacted in the 1993 version.

[6]Notably, as this court has already pointed out, the drafters of Proposition 103 *had* considered the Proposition's potential impact on the State's tax revenues, i.e., that rolling back insurance premium rates paid by consumers could result in the loss of revenue from the taxation of insurance premiums. Therefore, Proposition 103 provided the State Board of Equalization with the power, as delineated in Revenue and Taxation Code section 12202.1, to raise the rate of insurance premium taxes for several years in order to make up for any anticipated loss of tax revenues. (*Pacific Mutual Life Ins. Co.* v. *State Bd. of Equalization* (1996) 41 Cal.App.4th 1153, 1157, fn. 2 [49 Cal.Rptr.2d 99].)

Revenue and Taxation Code section 12202.1 provides: "Notwithstanding the rate specified by Section 12202, the gross premiums tax rate paid by insurers for any premiums collected between November 8, 1988 and January 1, 1991 shall be adjusted by the Board of Equalization in January of each year so that the gross premium tax revenues collected for each prior calendar year shall be sufficient to compensate for changes in such revenues, if any, including changes in anticipated revenues, arising from this act [Proposition 103]. In calculating the necessary adjustment, the Board of Equalization shall consider the growth in premiums in the most recent three year period, and the impact of general economic factors including, but not limited to, the inflation and interest rates."

policyholders. Thus, it is clear that the effect of section 769.2 is to shift the ultimate payment and burden of the taxes and commissions paid on excess premiums (i.e., premiums above the allowable amount which could be charged in keeping with the rate of return continuum) from the Insurers and/or the State of California and/or the Agents and Brokers to the policyholders.

As noted above, the Department of Insurance would not allow the Project to intervene in any of the hearings as to the rollback obligations to argue that section 769.2 was unconstitutional and could not be applied in determining the rollback obligations, so the Project filed this action, lost in the trial court, and now appeals.

CONTENTIONS ON APPEAL

The Project contends that the Legislature could only amend the provisions of Proposition 103 to further that Proposition's purposes, and that section 769.2 does amend the Proposition's provisions, but in a way which does *not* further such purposes. Therefore, the Project contends, section 769.2 is invalid as an act beyond the Legislature's power.

The Commissioner, the Insurers, and the Agents and Brokers[7] contend that section 769.2 does *not* amend the provisions of Proposition 103, that, even assuming the section does have an amendatory effect, it furthers Proposition 103's purposes by preserving the "constitutional exemption" to section 1861.01 created by the court in *Amwest Surety Ins. Co.* v. *Wilson* (1995) 11 Cal.4th 1243 [48 Cal.Rptr.2d 12, 906 P.2d 1112] (*Amwest*) and that even if section 769.2 does not further the purposes of Proposition 103, the section has an acceptably neutral effect on those purposes. The Commissioner also contends that the Project's facial attack on section 769.2 must fail if there is any situation in which it constitutionally could be applied.

DISCUSSION

1. *Section 769.2 Amends Proposition 103*

When a statute enacted by the initiative process is involved, the Legislature may amend it only if the voters specifically gave the Legislature that power, and then only upon whatever conditions the voters attached to

---

[7]We recognize that the Commissioner, the Insurers and the Agents and Brokers are united in their views on the issues presented by this appeal; we, therefore, will hereafter refer to them collectively as the "Commissioner."

the Legislature's amendatory powers. (Cal. Const., art. II, § 10, subd. (c); *Amwest, supra,* 11 Cal.4th 1243, 1251.) The purpose of California's constitutional limitation on the Legislature's power to amend initiative statutes is to "protect the people's initiative powers by precluding the Legislature from undoing what the people have done, without the electorate's consent." (*Huening* v. *Eu* (1991) 231 Cal.App.3d 766, 781 [282 Cal.Rptr. 664] (conc. and dis. opn. of Raye, J.); see *DeVita* v. *County of Napa* (1995) 9 Cal.4th 763, 788-795 [38 Cal.Rptr.2d 699, 889 P.2d 1019] [local electorate's constitutionally guaranteed right to initiative (Cal. Const., art. II, § 11) was protected by Elections Code section 9125, which provides that no initiative adopted by either the voters or the board of supervisors " 'shall be repealed or amended except by a vote of the people, unless provision is otherwise made in the original ordinance' " (9 Cal.4th at p. 788); "Elections Code section 9125 has its roots in the constitutional right of the electorate to initiative, ensuring that successful initiatives will not be undone by subsequent hostile boards of supervisors" (*ibid.*)].)

■ By its terms, Proposition 103 provides that *"The provisions of this act shall not be amended by the Legislature except to further its purposes."* (Prop. 103, § 8, subd. (b), 1 Stats. 1988, p. A-290.) If section 769.2 does not amend the provisions of Proposition 103, then we need not consider whether section 769.2 furthers the purpose of Proposition 103. The first question to be resolved, therefore, is whether section 769.2 actually amends the provisions of Proposition 103. The Commissioner contends that section 769.2 does not amend or "affect" Insurance Code section 1861.01. We disagree.

The Commissioner argues that section 769.2 does not actually amend Proposition 103 because section 769.2 "is not directed to any provision of Proposition 103, let alone [toward] changing the scope and effect of such a provision by adding or subtracting something from it." According to the Commissioner, section 769.2 in no way affects the 20 percent rollback mandated by section 1861.01, subdivision (a), but instead merely pertains to only one of many variables (that variable being the expense of commissions and taxes paid in connection with acquiring income in the form of premiums) used in the Commissioner's "constitutional percentage calculation" formula. Therefore, the Commissioner contends, section 769.2 is not an amendment to Proposition 103.

■ An amendment has been defined as " ' "any change of the scope or effect of an existing statute, whether by addition, omission, or substitution of provisions, which does not wholly terminate its existence, whether by an act purporting to amend, repeal, revise, or supplement, or by an act independent

and original in form, . . ." [Citation.] A statute which adds to or takes away from an existing statute is considered an amendment. [Citation.]' . . . [A]n amendment [is] ' " " 'a legislative act designed to change some prior or existing law by adding or taking from it some particular provision.' " ' " [Citation.]" (*Mobilepark West Homeowners Assn.* v. *Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 40 [41 Cal.Rptr.2d 393], quoting *Franchise Tax Bd.* v. *Cory* (1978) 80 Cal.App.3d 772, 776-777 [145 Cal.Rptr. 819].)

An amendment of an initiative may be accomplished by some action other than by the subsequent enactment of a statute; the question is whether the action in question adds to or takes away from the initiative. (See, e.g., *Franchise Tax Bd.* v. *Cory, supra,* 80 Cal.App.3d at pp. 773, 777 [initiative enacted by voters was amended by "control language" in budget item, which, in part, significantly restricted the manner in which audits were to be conducted].)[8] In determining whether a particular action constitutes an amendment, we keep in mind that "[i]t is ' "the duty of the courts to

[8]In *Franchise Tax Bd.* v. *Cory, supra,* 80 Cal.App.3d 772, the voters had enacted the Political Reform Act of 1974 (the Act), an initiative statute. Under the Act, the Franchise Tax Board was to audit the financial reports submitted by candidates for public office. The Act specifically provided that it could only be amended by the Legislature to further its purposes. In 1977, the Legislature passed the annual budget for 1977-1978. Item 106(d) of the budget made an appropriation to the Franchise Tax Board to carry out its duties under the Act. Accompanying the appropriation was "control language" which provided, in relevant part, that audits must be conducted according to audit standards promulgated by the American Institute of Certified Accountants, and that none of the appropriated funds could be used for audit inquiries of more than a 10 percent sample of the campaign transactions subject to audit, and that such sample could only be done by a letter which only required a contributor to verify the amount reported and then only if the contributor's records differed from the reported amount. (80 Cal.App.3d at pp. 773-774.)

The Governor "item vetoed" the "control language," but not the appropriation " 'because it raised a serious constitutional issue of the separation of powers.' " (80 Cal.App.3d at p. 775.) The Legislature then adopted a resolution urging the State Controller not to allow the use of any funds appropriated by Item 106 in a manner contrary to the "control language," and the Controller then advised the Franchise Tax Board that because of the possibility he would be personally liable for the use of such funds, he would not issue any warrants for expenditures which did not conform to the "control language." (*Ibid.*)

The Franchise Tax Board petitioned the California Supreme Court for a writ of mandate to compel the Controller to disregard the "control language." The California Supreme Court transferred the matter to the appellate court, which, noting that it was undisputed that the Legislature had not complied with the Act's amendment procedures, addressed the issue of whether Item 106 was, in fact, an "amendment" to the Act.

The appellate court first noted that the audit provisions of the Act did not conflict with the "control language" of Item 106, because the Act itself did not prescribe any particular auditing standard to be used, nor did it proscribe the use of a sampling technique. However, it also noted that the presence of a conflict was not an essential nor even a normal attribute of an amendment. (80 Cal.App.3d at p. 776.) All that was necessary to find that Item 106 was an invalid amendment was that it "unquestionably adds to the Act, both by clarifying the standards to be used and by significantly restricting the manner in which audits are to be conducted." (*Id.* at p. 777.) The court pointed out that while the Legislature's unauthorized

jealously guard [the people's initiative and referendum power]" . . . . "[I]t has long been our judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right [to local initiative or referendum] be not improperly annulled." ' [Citation.]" (*DeVita* v. *County of Napa, supra,* 9 Cal.4th at p. 776, quoting *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 591 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) Any doubts should be resolved in favor of the initiative and referendum power, and amendments which *may* conflict with the subject matter of initiative measures must be accomplished by popular vote, as opposed to legislatively enacted ordinances, where the original initiative does not provide otherwise. (*DeVita* v. *County of Napa, supra,* 9 Cal.4th at p. 792; *Mobilepark West Homeowners Assn.* v. *Escondido Mobilepark West, supra,* 35 Cal.App.4th at p. 41.)

▄▄ Applying these principles to the case here, it is apparent that section 769.2 is an attempted amendment of Proposition 103, because the section both "takes away" from the provisions of the Proposition and changes its scope and effect. Proposition 103 made the position of Commissioner an elected rather than appointed position, thus making the Commissioner responsive to the voters, not the Legislature. Proposition 103 authorized the Commissioner, not the Legislature, "to adopt a ratemaking formula to implement the rate rollback requirement provision—specifically, to determine whether, for an individual insurer, a maximum rate for the rollback year higher than 80 percent of the 1987 rate is required to avoid confiscation and, if so, what such higher maximum rate is." (*20th Century, supra,* 8 Cal.4th at p. 285.) As the Commissioner concedes, under Proposition 103, it is the Commissioner, not the Legislature, who is to determine the minimum nonconfiscatory rate. Thus, because section 769.2 removes from the Commissioner the discretion to determine whether any or all of the taxes and commissions paid by an insurer (which were paid by the insurer in connection with collecting premiums which were higher than the allowable at-least-20-percent-less-than-the-1987-premiums) were reasonable expenses and deductible from the insurer's gross premiums (which premiums in turn form one factor in determining the insurer's actual rate of return on its capital investments), the enactment of section 769.2 "takes away" from the provisions of Proposition 103, which vest ratemaking determinations with the Commissioner. (See *Franchise Tax Bd.* v. *Cory, supra,* 80 Cal.App.3d 772 [although the initiative itself did not prescribe any particular auditing standard to be used, nor did it proscribe the use of a sampling technique, the

attempt to control the manner in which audits were to be conducted was arguably a violation of the separation of powers, its holding was not based on that theory, but simply on the fact that the "control language" in Item 106 "undertakes substantively to amend the Act and does so in violation of the procedural requirements of [the Act] and of article II, section 10, subdivision (c) of the California Constitution." (*Id.* at p. 777, fn. 6.)

Legislature could not validly take any action which would require the Franchise Tax Board to use a particular auditing standard or to use a sampling technique].)

█  In other words, the Legislature cannot indirectly accomplish, via the enactment of a statute which essentially amends any formula adopted to implement an initiative's purpose, what it cannot accomplish directly by enacting a statute which amends the initiative's statutory provisions. To hold otherwise would elevate form over substance, in contravention of Civil Code section 3528 and well-established judicial principles,[9] and would mean that the voters' prohibition on any amendments save those which further their purposes in adopting an initiative would be "of little worth if it can be evaded by so simple a device." (*Cashman v. Root* (1891) 89 Cal. 373, 383 [26 P. 883].) As the court in *Sheehy v. Shinn* (1894) 103 Cal. 325 [37 P. 393] stated: "To give effect to the constitution, it is as much the duty of the courts to see that it is not evaded as that it is not directly violated. This is the principle of the decision in *Cashman v. Root*, 89 Cal. 373, [26 Pac. 883],˙ . . . Counsel attempt to establish a distinction by pointing to the fact that in that case the defendant expressly admitted that the object of the transaction there in question was a course of dealing in stocks on margin. But what was there admitted in terms is here amply established in *substance*, the name only being suppressed." (*Sheehy v. Shinn, supra,* 103 Cal. at p. 340.)[10]

---

[9]For example, in *Hicks v. Board of Supervisors* (1977) 69 Cal.App.3d 228 [138 Cal.Rptr. 101], the Court of Appeal invalidated a county resolution transferring members of the district attorney's investigative staff to the sheriff. Although the board of supervisors characterized this act as budgetary in nature, and the *Hicks* court recognized and validated the board's budgetary power, it found that the resolution there was in substance a transfer of functions rather than a budgetary measure, and that, as such, the action was in excess of the board's jurisdiction, for it had no statutory or constitutional power to transfer control over the district attorney's subordinate employees.

The court held that neither the fact that the board characterized its action as budgetary, nor the fact that the action was taken during a budget hearing, was determinative: "The law respects form less than substance. (Civ. Code, § 3528.) . . . . The nature of the proceeding must be determined from the substance of the action taken regardless of its designation. (See *Edson v. Southern Pacific R. R. Co.*, 144 Cal. 182, 188-189 [77 P. 984].) The end attained and not the form of the transaction must be considered by the court in determining its substance and legal effect. (*Cashman v. Root*, 89 Cal. 373, 384 [26 P. 883].)" (*Hicks v. Board of Supervisors, supra,* 69 Cal.App.3d at p. 237.)

[10]*Cashman* and *Sheehy* both involved a challenge to then article IV, section 26 of the California Constitution of 1879 (now art. II, § 12, as amended), a constitutional provision intended to prohibit wagering contracts in regard to the future market value of stocks: "It is said that in California, when the Constitution was adopted, the whole people were buying mining stocks in this way [on margin] with the result of infinite disaster. [Citation.] . . . Inserting [article IV, section 26] in the Constitution showed, as we have said, the conviction

Here, it is readily apparent not only that, as a matter of substance, section 769.2 does change the effect of existing law (ratemaking regulations being a species of "existing law" (see *Morrison* v. *Viacom, Inc.* (1997) 52 Cal.App.4th 1514, 1523-1524 [61 Cal.Rptr.2d 544]), but also that the Legislature expressly intended and believed section 769.2 would have some effect on Proposition 103, as demonstrated by the repeated references to Proposition 103 in the statement of legislative intent as to the 1993 repeal and reenactment of section 769.2, including the pronouncement that *"The Legislature finds and declares that this statute furthers the purpose of Proposition 103."* (Stats. 1993, ch. 1248, § 1, italics added.) Given these circumstances, we would not be fulfilling our duty to protect the voters' constitutional powers to enact laws through the initiative process if we refused to recognize section 769.2 for what it really is.

In seeking to avoid the inevitable conclusion that section 769.2 does, in fact, amend the provisions of Proposition 103, the Commissioner argues that section 769.2 does not amend "an initiative statute." His reasoning is as follows: First, the voters' purpose in enacting Proposition 103's minimum 20 percent rate rollback[11] was to require all insurers to reduce their 1989 rates to at least 20 percent less than their November 8, 1987 rates; second, in *CalFarm, supra,* 48 Cal.3d at p. 815, this purpose was found unconstitutional on its face because it precluded rate adjustments necessary to avoid confiscation; and third, it must be assumed that the Legislature can enact subsequent legislation relating to a facially unconstitutional provision (apparently regardless of whether such subsequent legislation furthers the purpose of Proposition 103), because there is no reason the Legislature should be precluded from "undoing" something which is unconstitutional. In other words, section 769.2 amends section 1861.01, section 1861.01 was held to be unconstitutional, and there is no good reason the Legislature should not be allowed to amend an unconstitutional provision of an initiative.

The problem with this argument is immediately apparent. **(6)** Once a portion of an initiative has been held to be unconstitutional and severable,

---

of the people at large that prohibition was a proper means of stopping the evil." (*Otis* v. *Parker* (1903) 187 U.S. 606, 610 [23 S.Ct. 168, 170, 47 L.Ed. 323].) The California Constitution of 1879 was adopted after being submitted to the people of California for a vote. (Hinke, Cal. Legal Guide (2d ed. 1976) § 2.5, 57.) "Even if the provision before us [article IV, section 26] should seem to us not to have been justified by the circumstances locally existing in California at the time when it was passed, it is shown by its adoption to have expressed a deepseated conviction on the part of the people concerned as to what the policy required. Such a deep-seated conviction is entitled to great respect." (*Otis* v. *Parker, supra,* 187 U.S. at p. 609 [23 S.Ct. at p. 170].)

[11]It should be noted that this argument is premised on the voters' purpose in enacting *one* of Proposition 103's provisions, *not* in enacting Proposition 103 as a whole.

that portion is void and has been stricken from the initiative. (*CalFarm, supra,* 48 Cal.3d at p. 836 ["the rule is clear: the offending part must be stricken from the initiative, and the remainder may take effect"].) **(1e)** The Legislature cannot very well amend something which no longer exists. (*Board of Osteopathic Examiners* v. *Board of Medical Examiners* (1975) 53 Cal.App.3d 78, 84 [125 Cal.Rptr. 619] [whether the Legislature validly could amend an initiative measure necessarily depended upon a determination of what, if anything, remained of the measure after a judicial decision struck part of it as unconstitutional].)

Thus, the Commissioner's argument that the Legislature amended only an unconstitutional provision of Proposition 103 is illogical. The reason it is illogical is that it is based on the faulty premise that the voters' *purpose* in enacting Proposition 103 was unconstitutional. *CalFarm, supra,* 48 Cal.3d 805, did not so hold. Instead, *CalFarm* held that section 1861.01, *subdivision (b) alone,* which limited insurers to seeking individualized relief from the 20 percent minimum rollback rate only when they were "substantially threatened with insolvency," was unconstitutional (*CalFarm, supra,* 48 Cal.3d at p. 815; *20th Century, supra,* 8 Cal.4th at p. 287 ["*CalFarm* invalidated the procedural mechanism for relief from the rate rollback requirement provision *and not* the rate rollback requirement provision itself. It substituted the procedural mechanism for the 'prior approval' system *and not* the substantive standard of the 'prior approval' system"]), because it did not assure that insurers would be able to receive a constitutionally required minimum rate of return on their invested capital. (*CalFarm, supra,* 48 Cal.3d at pp. 816-821.) The court in *CalFarm* resolved this problem by severing unconstitutional section 1861.01, subdivision (b), from the rest of Proposition 103, thus leaving section 1861.05 as the general standard upon which rate adjustment would be based. (48 Cal.3d at p. 822; *20th Century, supra,* 8 Cal.4th at p. 244.)

Section 1861.05 provides, in relevant part, that "(a) No rate shall be approved or remain in effect which is excessive, inadequate, unfairly discriminatory or otherwise in violation of this chapter [Chapter 1, "General Regulations"]. In considering whether a rate is excessive, inadequate or unfairly discriminatory, no consideration shall be given to the degree of competition and the commissioner shall consider whether the rate mathematically reflects the insurance company's investment income." This general standard requires rates within a range that can be described as "fair and reasonable" (*CalFarm, supra,* 48 Cal.3d at pp. 822-823; *20th Century, supra,* 8 Cal.4th at p. 244), and rates which are "fair and reasonable" are constitutional, i.e., are not confiscatory. (*CalFarm, supra,* 48 Cal.3d at p. 816, fn. 5;

*20th Century, supra,* 8 Cal.4th at pp. 244-245.) Thus, the court in *CalFarm, supra,* did not hold that the voters' *purpose* in enacting Proposition 103 was unconstitutional, nor did it hold that section 1861.01, *subdivision (a),* was unconstitutional. In other words, requiring a minimum rollback of at *least* 20 percent is constitutional, so long as each insurer is allowed to seek relief from the minimum rollback rate to avoid an unconstitutionally confiscatory rate, and a minimum rollback of at *least* 20 percent is a constitutional purpose. Obviously, given Proposition 103's condition that no amendment of its provisions is allowed unless such amendment furthers the purpose of the Proposition, it follows that the Legislature cannot enact any statute which has the effect of "undoing" this requirement of an at *least* 20 percent rollback of charges for insurance coverage (i.e., premiums).

### 2. *Section 769.2 Does Not Further the Purposes of Proposition 103, and Therefore Its Enactment Was an Act Beyond the Legislature's Powers*

Assuming arguendo that section 769.2 is an amendment of Proposition 103, the Commissioner next contends that the California Constitution does not preclude the Legislature from enacting legislation "which is neither in conflict with the language of an initiative measure nor destructive of the initiative's purpose," citing *Huening* v. *Eu, supra,* 231 Cal.App.3d at p. 788.) However, this quote comes from the dissenting and concurring opinion of Justice Raye in that opinion, and the quote itself is not supported by any citation to authority. The actual rule as to the Legislature's power to amend initiatives is that the voters may deny the Legislature any power to amend an initiative, or they may *condition* legislative power to amend as they see fit. (Cal. Const., art. II, § 10, subd. (c); *Amwest, supra,* 11 Cal.4th at p. 1251.)

Here, the voters required as a condition of any amendment that the amendment must *further* the purposes of Proposition 103. (Prop. 103, § 8(b), 1 Stats. 1988, p. A-290; *Amwest, supra,* 11 Cal.4th at pp. 1255-1256 ["Pursuant to article II, section 10, subdivision (c), of the California Constitution, the Legislature lacks the authority to amend Proposition 103 except to further the purposes of the initiative. Such a limitation upon the power of the Legislature must be strictly construed, but it must also be given the effect the voters intended it to have"].) Thus, even though there is a presumption that the Legislature acted within its authority when it enacted section 769.2, such a legislative amendment of Proposition 103 may only be upheld if, by any reasonable construction, it could be said to further purposes of that Proposition. (*Amwest, supra,* 11 Cal.4th at p. 1256.)

In discerning the purposes of an initiative so as to determine whether a legislative amendment furthers its purpose and thus is valid, we are guided

by, but not limited to, the general statement of purpose found in the initiative. (*Amwest, supra,* 11 Cal.4th at p. 1256.) ■ Here, the purposes behind Proposition 103 have already been determined by the California Supreme Court: "[T]wo major purposes of Proposition 103 were to reduce, by at least 20 percent, the rates for all insurance regulated under chapter 9 [of the Insurance Code] and to replace the former system for regulating insurance rates." (*Amwest, supra,* 11 Cal.4th at p. 1259.) The Commissioner, quoting *Amwest, supra,* 11 Cal.4th at 1261-1263, contends that after the decision in *CalFarm,* the "pertinent *constitutional* purpose of Proposition 103, against which the effect of section 769.2 must be measured" has been changed, and that the (implicitly only) purpose now is to "ensure that rates were fair and reasonable at the inception of the regulations promulgated in Proposition 103."

The problem with the Commissioner's argument is that it assumes that the *only* relevant purpose against which section 769.2 must be measured is the purpose of the rollback provision as interpreted by *CalFarm.* Not so. When the purpose behind section 1861.01, subdivision (a), is considered in light of the purpose behind section 1861.05 (which remained in effect after the court in *CalFarm* invalidated section 1861.01, subdivision (b)), it is apparent that the overall purpose of Proposition 103 is to require that premiums be set at the *lowest rate possible* commensurate with the constitutional prohibition against confiscatory rates, i.e., the purpose is to return to the policy holders the *maximum* amount of premium refunds which is consistent with the constitutional prohibitions against confiscatory rates. Thus, the relevant question is whether section 769.2 furthers *this* purpose. It does not, as was made clear in *20th Century, supra,* 8 Cal.4th 216:

"Under Proposition 103 as construed in *CalFarm,* insurers were allowed to file 'rollback-exemption' applications. An insurer that filed such an application should not be 'penalized' for having charged, pending approval and subject to refund, a rate for the rollback year higher than the maximum rate of 80 percent of the 1987 rate. That appears obvious. But neither should it be 'rewarded' for having done so. That seems less obvious. It is nonetheless true. As stated, the ratemaking formula is designed to yield a premium that the insurer should receive from its insureds in order to earn a sum amounting to (1) the reasonable cost of providing insurance and (2) the capital used and useful for providing insurance multiplied by a fair rate of return. By charging a higher rate for the rollback year, the insurer 'increased' its cost of providing insurance, for example, by incurring liability for added commissions, state premium tax, and federal income tax on the added premiums. It also 'increased' its capital multiplied by a rate of return, specifically by 'increasing' its capital base, for example, by triggering added surplus to back

up the added premiums. Such 'increases' would inflate the premium yielded by the ratemaking formula. They cannot be recognized. If they were, a higher rate would be self-justifying: the *fact* that the insurer charged such a rate would grant it a *right* to have done so. That cannot be. There is surely no unfairness in nonrecognition. Insurers were on notice that, in charging a higher rate, they were proceeding at their own risk: they had to establish their entitlement to that rate; it did not carry its entitlement within itself.

"For illustration, let us consider the following example. Insurer *A* and Insurer *B* are similarly situated. The 1987 rate for each was $1,000. A maximum rate for the rollback year of 80 percent of the 1987 rate, viz., $800, is nonconfiscatory and otherwise lawful for each under the rate rollback requirement provision of Proposition 103. Not disputing the matter, Insurer *A* reduces its rate to $800. Filing a 'rollback-exemption application,' Insurer *B* takes the opposite path and increases its rate to $1,200. In so doing, Insurer *B* 'increases' its cost of providing insurance by incurring liability for: (1) added commissions at, say, the customary rate of 20 percent on the added premium of $400, equaling $80; (2) added state premium tax at, say, the established rate of 2.37 percent on the added premium of $400, equaling $9.48; and (3) added federal income tax at, say, the marginal rate of 34 percent on the added premium of $400, equaling $136—to the total of $225.48. Insurer *B* also 'increases' its capital multiplied by a rate of return. It does so, specifically, by 'increasing' its capital base, by triggering added surplus at, say, the simplest leverage ratio of 1:1, to back up the added premium of $400, in the amount of $400. Let us assume a rate of return of 10 percent. Insurer *B* thereby 'increases' its capital multiplied by a rate of return to the total of $40. Insurer *B's* 'increases,' if they were recognized, would inflate the premium yielded by the ratemaking formula by $265.48— $225.48 for the 'cost' component *plus* $40 for the 'capital' component. In other words, Insurer *B's* 'increases,' if they were recognized, would 'increase' its maximum rate for the rollback year from $800 to $1,065.48. They cannot be recognized. Insurer *B* has charged $400 too much: it must refund that amount. It should suffer no 'penalty' for its overcharge. That means that it must refund *only* $400 (exclusive of interest). But neither should it be given a 'reward' for its overcharge. That means that it must indeed refund *$400* (exclusive of interest). Otherwise, inequity would result. There would be unfairness between Insurer *A* and Insurer *B*, which would be treated dissimilarly as subjects of the rate rollback requirement provision, Insurer *A* with a maximum rate of $800 and Insurer *B* with a maximum rate of $1,065.48. There would also be unfairness between Insurer *B* and its insureds; the former overcharging the latter and the latter overpaying the former in the amount of $265.48. Lastly, there would be unfairness between the insureds of Insurer *A* and the insureds of Insurer *B*, who would be treated

dissimilarly as beneficiaries of the rate rollback requirement provision, the former receiving the mandated decrease in rates equaling $200 and the latter receiving a prohibited increase in rates equaling $265.48." (*20th Century, supra,* 8 Cal.4th at pp. 283-284, original italics.)

"We do not think it improper—constitutionally or otherwise—for the rate regulations as to rollbacks to recognize as the insurer's cost of service only the *reasonable* cost of providing insurance. It is not objectionable that the ratemaking formula's efficiency standards operate to define the reasonable cost of providing insurance after subjecting the insurer's 'expenses . . . to downward normative pressure.' [Citation.] . . . It is also not objectionable that the ratemaking formula's variable expense factor excludes from the reasonable cost of providing insurance such commissions and state premium taxes as would have been avoided had the insurer charged a rate for the rollback year no higher than the maximum rate set by Proposition 103 as construed in *CalFarm*—i.e., the rate that is 80 percent of the 1987 rate or such rate greater than 80 percent of the 1987 rate as is minimally nonconfiscatory. '[I]t surely cannot be reasonable for an investor to assume that each and every expenditure . . . will be allowed by regulatory authorities.' [Citation.]" (*20th Century, supra,* 8 Cal.4th at pp. 289-290, original italics.)

■ In enacting section 769.2, the Legislature has *required* the Commissioner to allow an insurer who did not comply with Proposition 103's premium rollback to recover its entire cost of state premium taxes and commissions, despite the fact that in calculating an insurer's rate of return so as to maximize refunds while not subjecting the insurer to a constitutionally prohibited confiscatory rate of return, a regulated entity properly may be disallowed an element of its costs—even one that is reasonable—without suffering an unconstitutional taking or a denial of due process under either state or federal law. (*20th Century, supra,* 8 Cal.4th at p. 308; *B. & O. R. Co. v. United States* (1953) 345 U.S. 146, 147-150 [73 S.Ct. 592, 593-594, 97 L.Ed. 912, 914-916].)

These two items—commissions and state taxes—also are featured as elements of another factor used in the ratemaking process—the variable expense factor. (Cal. Code Regs., tit. 10, § 2644.14.) "The variable expense factor is the sum of the commission rate and the state premium tax rate. Within the ratemaking formula, it functions to recognize only such amount of commissions and state premium taxes as are attributable to the maximum rate for the rollback year set by Proposition 103 as construed in *CalFarm.* The Superior Court thought this objectionable. It is not. Otherwise, a rate above the maximum would tend to justify itself—surely an untenable result. It is not unreasonable to fail to recognize that amount of commissions and

state premium taxes that would have been avoided had [the insurer] charged a rate at or below the maximum for the rollback year." (*20th Century, supra,* 8 Cal.4th at p. 323.) Refusing to recognize excess commission payments and excess premium taxes simply "puts [an Insurer] and its insureds into the situation they would each have occupied had the former not overcharged the latter and the latter not overpaid the former." (*20th Century, supra,* 8 Cal.4th at p. 328.) Concomitantly, requiring such excess commission payments and excess premium taxes to be treated as fully deductible expenses against income (the effect of section 769.2) puts the insureds into a less favorable position—one in which they, not the insurer, bear the cost of such excess taxes and commission in the form of reduced refunds.

Given the effect of requiring the Commissioner to allow those insurers. who did not voluntarily roll back their 1988-1989 premium rates to deduct the full amount of the taxes and commissions on such excessive premiums, it is obvious that section 769.2 does not further the provisions of Proposition 103.

### 3. *The Project's Facial Attack on Section 769.2 Is Proper*

The Commissioner finally contends that the Project's facial challenge to section 769.2 must fail unless it can demonstrate that section 769.2's provisions " 'inevitably pose a . . . total and fatal conflict with applicable constitutional prohibitions' " (*Arcadia Unified School Dist.* v. *State Dept. of Education* (1992) 2 Cal.4th 251, 267 [5. Cal.Rptr.2d 545, 825 P.2d 438]), and that a facial challenge must fail if this court can conceive of any situation in which the statute could be constitutionally applied (*In re Marriage of Siller* (1986) 187 Cal.App.3d 36, 48-49 [231 Cal.Rptr. 757].)

In response, the Project points out that an exception to this latter rule has been recognized for statutes imposing criminal liability or impinging upon constitutional rights (usually of free speech). (*In re Marriage of Siller, supra,* 187 Cal.App.3d at p. 49; *Mulkey* v. *Reitman* (1966) 64 Cal.2d 529, 543-544 [50 Cal.Rptr. 881, 413 P.2d 825] ["We have recognized that a statute which has unconstitutional applications may nevertheless be effective in those instances where the Constitution is not offended. [Citation.] . . . . But . . . '. . . [w]hen the application of the statute is invalid in certain situations we cannot enforce it in other situations if such enforcement entails the danger of an uncertain or vague future application of the statute [citations].' "].) Statutes of these latter types may be declared invalid in their entirety if piecemeal adjudication of the legality of the statute would entail the vague or uncertain future application of the statute, thereby inhibiting the exercise of constitutional rights. (*In re Marriage of Siller, supra,* 187

Cal.App.3d at p. 49; *Mulkey* v. *Reitman, supra,* 64 Cal.2d at pp. 543-544; see Tribe, American Constitutional Law (1978) §§ 12-24, 12-25, pp. 710-714.)

The Project then relies on *American Academy of Pediatrics* v. *Lungren* (1997) 16 Cal.4th 307, 343 [66 Cal.Rptr.2d 210, 940 P.2d 797] for the proposition that a facial challenge to a statutory provision that broadly impinges upon fundamental constitutional rights may not be defeated simply by showing that there may be some circumstances in which the statute constitutionally could be applied, when there is nothing in the language or legislative history of the provision that would afford a reasonable basis for severing the asserted constitutionally permissible applications of the statute from the provision's unconstitutional applications. *American Academy of Pediatrics,* however, involved fundamental *privacy* rights; such rights are not implicated here. However, the Project argues that because the voters' right to implement their policy judgment through the initiative process is also a fundamental right (*Taxpayers to Limit Campaign Spending* v. *Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 768 [274 Cal.Rptr. 787, 799 P.2d 1220]; *Brosnahan* v. *Brown* (1982) 32 Cal.3d 236, 241 [186 Cal.Rptr. 30, 651 P.2d 274]), the same exception to the general rule as to facial challenges should apply.

We need not reach this issue, however, because section 769.2 suffers from a defect which is apparent without regard to the results of its actual application. As noted above, section 769.2 does not further the purposes of Proposition 103. Because it does not further the purposes of Proposition 103, it is an act in excess of the amendatory powers granted to the Legislature by the voters, and hence, it is invalid regardless of how it might be applied in any given case. Therefore, this facial challenge is proper.

### DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings not inconsistent with this opinion. The Proposition 103 Enforcement Project shall recover its costs on appeal.

Kitching, J., and Aldrich, J., concurred.

Appellant's petition for review by the Supreme Court was denied September 16, 1998.